(159 App. Div. 531)

PEOPLE ex rel. NEW YORK, N. H. & H. R. CO. v. PUBLIC SERVICE COMMISSION FOR SECOND DIST. et al.

(Supreme Court, Appellate Division, Third Department.    January 14, 1914.)

1. CARRIERS (§ 10*)—REGULATION—POWER OF PUBLIC SERVICE COMMISSION.

Public Service Commission Law (Consol. Laws, c. 48) § 33, subd. 4, empowering the Commission to fix reasonable and just commutation rates, is not unconstitutional, and authorizes the commission to fix less rates for commutation travelers than the just rates fixed by law for all travelers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

2. CARRIERS (§ 10*)—REGULATION—PUBLIC SERVICE COMMISSION.

The Public Service Commission cannot annul commutation rates established by a railroad company until it determines, upon satisfactory evidence, that they are unjust and unreasonable; the carrier having a statutory right to a hearing.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

3. CARRIERS (§ 12*)—RATES—MATTERS TO BE CONSIDERED.

In determining the reasonableness of rates, the expenses of maintenance, upkeep, and general expenses must be considered; as well as the actual cost of transportation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

4. CARRIERS (§ 10*)—REGULATION—POWER OF PUBLIC SERVICE COMMISSION.

The Public Service Commission cannot annul commutation rates established by a railroad company on the ground that they are a poor financial policy and, by discouraging commutation travelers, will injure the company in the long run, where such rates are not unjust and unreasonable, nor can it annul rates because a lesser rate would be to the advantage of the public.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

5. CARRIERS (§ 12*)—CARRIAGE OF PASSENGERS—RATES—PUBLIC SERVICE COMMISSION.

Rates established by railroad companies for commuters held not unjust and unreasonable, and hence they should not be annulled by the Public Service Commission.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

Howard and Woodward, JJ., dissenting in part.

This is a certiorari to review the order of the Public Service Commission, Second District, of January 31, 1913, directing the relator to cease on or before March 1, 1913, from charging the increased rates of fare for one-way and commutation passenger service, which it made effective July 1, 1910, and to charge and collect such fares at rates not exceeding those charged prior to July 1, 1910, and from an order refusing to consider that order.

Prior to July 1, 1910, the one-way rate from New York to Mt. Vernon was 30 cents; the 60-trip monthly commutation, good to the purchaser only and during the month, was $5.60; the family 50-trip ticket was $10.    On that day

the company increased these rates by making the one-way ticket 35 cents, the monthly ticket $6.75, and the family ticket $12.50. The rates in other localities between Mt. Vernon and the Connecticut line, considering the distances, were increased substantially in a proportionate manner. ·

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Charles M. Sheafe, Jr., of New York City (Walter C. Noyes, of New York City, of counsel), for relator.

Ledyard P. Hale, of Albany, for Public Service Commission.

Joseph S. Wood, of Mt. Vernon, for City of Mt. Vernon.

Herbert Barry, of New York City, De Witt H. Lyon, of Port Chester (J. Mayhew Wainwright, of New York City, of counsel), for Intervener Erricsson.

JOHN M. KELLOGG, J. The questions involved are whether the Commission has power to fix commutation rates, and, if so, whether it has properly exercised that power.

[1] Section 33 of the Public Service Commission Law, at subdivision 4, empowers the Commission to fix reasonable and just rates for such service. It is urged, however, that the statute is invalid under the rule of Lake Shore, etc., R. R. Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. In that case the statutes of Michigan had fixed a maximum passenger rate at three cents per mile; a subsequent enactment required the issuing of mileage books for 1,000 miles, good for two years, at a less rate. The court held that, having fixed a uniform maximum rate as to all passengers, such rate was the reasonable compensation for the service, and that the fixing of a less rate to particular individuals was an unreasonable and arbitrary exercise of legislative power; that it was not for the convenience of the public and thus within the police power, but was for the convenience of certain individuals who were permitted to travel upon the railroads for less than the reasonable rate prescribed by law; that the law was therefore in violation of the fourteenth amendment of the federal Constitution in depriving the company of its property without due process of law and by depriving it of the equal protection of the law.

In Beardsley v. N. Y., L. E. & W. R. R. Co., 162 N. Y. 230, 56 N. E. 488, the Court of Appeals felt constrained by the Smith Case to declare the mileage book law of this state invalid as to companies in existence at the time of its passage, but in Purdy v. Erie R. R. Co., 162 N. Y. 43, 56 N. E. 508, 48 L. R. A. 669, that law was held valid as to companies organized after the statute was passed.

In L. & N. R. R. Co. v. Kentucky, 183 U. S. 503, at page 511, 22 Sup. Ct. 95, at page 99 (46 L. Ed. 298) after citing the Smith Case and like cases, the court says:

"Nor yet are we ready to carry the doctrine of the cited cases beyond the limits therein established."

In the Minnesota Rate Case (Simpson et al. v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511), the legality of an order of the Commission of that state was recognized which fixed a maximum

freight rate and passenger rate, the latter at two cents a mile as the maximum fare for passengers 12 years of age or over, and one cent a mile for those under 12 years of age.

In Interstate R. R. Co. v. Massachusetts, 207 U. S. 79, 28 Sup. Ct. 26, 52 L. Ed. 111, 12 Ann. Cas. 555, the Massachusetts law prescribing special rates less than the maximum for school children was held valid. These cases indicate that the Smith Case is not to be extended beyond the facts upon which it rests.

The Smith Case distinguishes itself from this case where the court (173 U. S. at page 693, 19 Sup. Ct. at page 569 [43 L. Ed. 858]) says:

"This act is not like one establishing certain hours in the day during which trains shall be run for a less charge than during the other hours. In such case it is the establishing of maximum rates of fare for the whole public during those hours, and it is not a discrimination in favor of certain persons by which they can obtain lower rates by purchasing a certain number of tickets by reason of which the company is compelled to carry them at the reduced rate, and thus in substance to part with its property at a less sum than it would be otherwise entitled to charge. The power to compel the company to carry persons under the circumstances as provided for in this act, for less than the usual rates, does not seem to be based upon any reason which has hitherto been regarded as sufficient to authorize an interference with the corporation, although a common carrier and a railroad."

Our flourishing cities owe their position and prosperity, in part, to the commutation rates for suburban service; the health and welfare of the public are concerned that people doing business in the large cities may live in the country where the surroundings are pleasanter, more healthy, and to the advantage of themselves and their families. It is a known fact that such rates exist upon all railways entering large cities and have usually been established by the companies voluntarily in the interest of themselves and the public. The service is different in its nature from the other passenger service. It is so universal, of such large proportion, has become so necessary to the public, that it cannot be said that the fixing of reasonable and just rates for it is unusual or unreasonable or the granting of a benefit to individuals and not for convenience to the public. Nearly one-half of the passengers handled by the relator at the Grand Central terminal were of this class. Perhaps the same ratio would exist upon the other railroads serving the city. We conclude that the statute in question is valid as conferring a power on the Commission to regulate rates for the public convenience and welfare.

[2-5] We have now to consider whether the order under review was properly made. The Commission cannot annul the company's rates until it determines upon satisfactory evidence that they are unjust and unreasonable. The company's rates are challenged by citizens of Mt. Vernon and other localities in Westchester county between Mt. Vernon and the Connecticut line. It appears that the greater part of the traffic affected by the order is between Mt. Vernon and the Grand Central Station, and upon monthly tickets. It is unnecessary to consider separately other localities or other tickets, for, if the situation with reference to Mt. Vernon on the one-way ticket and the monthly 60-trip ticket is established, the other rates naturally stand or fall with them. The distance from Mt. Vernon to the Grand Central

station is 13.65 miles. It appears that on the average but about 49 of the 60 tickets are used, and the company realizes a little less than 14 cents per trip from its rates and a little less than 11½ cents per trip from the rates fixed by the Commission.

It is urged that the suburban service upon similar tickets in and out of New York on other lines is furnished at more favorable rates. Charges for service upon other lines would be material under like conditions, but, if the conditions are unlike, they are immaterial. The relator was chartered, by the Legislature of Connecticut, with power to build a road from Bridgewater, Conn., to the west line of Connecticut, towards the city of New York, and our statutes (chapter 195 of the Laws of 1846) permitted it to continue and extend its road from the state line through the county of Westchester to the line of the New York & Harlem Railroad, and to unite with that road at or near Williams Bridge, which is about 1¾ miles west of Mt. Vernon, with power to fix passenger rates not to exceed three cents per mile on the part of the road within the state. This line is devoted exclusively to passenger service. Its Harlem line to 135th street carries both freight and suburban traffic and is not in question here.

In order to get its passenger line into New York City, it became necessary for the company, in March, 1848, to make a contract with the Harlem Company to pay for the use of its tracks and facilities a per capita tollage based upon a sliding scale, and providing for an arbitration in case the rates proved unsatisfactory to either party. The last arbitration as to rates was in 1861, and we assume that the present rates are based thereon. Under it the company now pays 12.21 cents for each regular passenger and 4.07 cents for each commuter. (A 50-trip passenger is counted as two-thirds of a regular passenger.) The company also has a contract with the New York Central Company and the Harlem Company for the right to enter and use their Grand Central terminal, paying for such use a proportion of the interest on its cost, and of the maintenance and upkeep, less any income received on account of its use by others. The proportion to be paid by the company is based upon the number of its cars entering the station, compared with those of the owners, which resulted in the year 1910 that the relator paid 42 per cent. as its proportion of the charges. The rental being based upon the number of cars, after making due allowance for all cars outside of the strict passenger service, the cost to the relator for rentals, if all cars carried an equal number of passengers, would be 8½ cents per passenger, but the ordinary passenger car carried an average of about 30 passengers, while the commuter car carried about 46, with the result that the actual terminal charge against each commuter is about 6.77 cents. In addition to these charges, the relator bears the expense of propelling its trains into the terminal, which is 4.55 cents per person, so that it actually pays for each commuter 10.84 cents in tollage and terminal charges to the New York Central and Harlem Companies, and in addition it costs it 4.55 cents per passenger to propel its trains, making 15.39 cents actual cost to get a commuter from Mt. Vernon into the Grand Central Station, making no allowance for maintenance of equipment, main-

tenance of way, ordinary transportation expenses, and general expenses, including interest and taxes.

The order was made January 31, 1913. The question for determination was whether at that time the company's rates were reasonable and just. The issue had changed somewhat since the proceedings were instituted in July, 1910. The evidence in great part related to the situation in 1910, and was directed to the question whether the company was authorized to change its rates at that time. It was at least unfortunate that the case should be decided two years after the greater part of the evidence was taken. The reasons given by the Commission for its decision show that the real merits of the controversy were not passed upon, and that, as a matter of fact, it has not determined that the company's rates were unjust and unreasonable.

The defendant has the statutory right to a hearing. That right is not accorded it if the hearing is a mere matter of form, the decision is arbitrary, and the real question for consideration is lost sight of. It is not necessary to determine that the Commission made a reversible error in ruling that the rates established by the company were presumably unjust and unfair because it had formerly a lower rate. This clearly was an error. These proceedings are quite informal, and if the Commission has in fact tried the issue, has received and considered all the evidence bearing upon it, and its decision is fairly warranted, the exceptions taken during the trial are of little avail. The question, however, is always present: Did the Commission in fact decide the question as to which the law gives the relator the right to a hearing? And does its decision rest upon a proper basis? The Commission gives reasons, which it numbers from 1 to 4, for its conclusion that the company has not overcome the presumption that the increase of rates was unreasonable and unjust, in substance: (1) That the public interests, and the interests of the company, require the lowest possible rate; that the question is not "just how many tenths of a cent the rate can be raised or lowered for each mile of travel, but at what point it should be placed to enlarge the commuting business, increase the suburban population, and thereby increase the general prosperity. Of course this point must be fixed with proper reference to the fair and reasonable returns to which the corporation is entitled over and above the actual out-of-pocket expenses involved in performing the service." (2) That the increased rates has affected the localities unfavorably. (3) That the revenue derived by the company from the increased rates was not proportionate to the increase; that the rates had in fact lessened traffic. (4) That the tollage and terminal charges should be wholly charged upon the entire road and not upon the passenger service into and out of the station. It recognized that, by reason of the increase in wages and material, the cost of operation was greater, but says that in a great part the increased expenses came from the substitution of electric for steam power. That such substitution made possible the use of the Grand Central Station for rentals which might in the future pay an adequate return upon the cost of the station. It continues:

"It is a serious question, to be determined only by future developments, whether the use of electric energy is not the only possible method of eco-

nomical operation in a city like New York, and whether it will not, all things considered, justify the continuance of the former rates rather than an increase in rates."

It is conceded that the public interests demand a low rate, and that the lower the rate the better it is for the patrons of the road, so long as the road can be saved from bankruptcy and is able to continue a reasonable service. It is not clear what the Commission intended to allow the relator under the expression "actual out-of-pocket expenses involved in the performance of the service." If it means to exclude, as we infer it does, a consideration of the maintenance and general expenses, interest, upkeep of the track, and equipment, and include merely the expense of running the train itself, the Commission proceeded upon a wrong basis. In any event, the determination cannot rest upon the uncertainty as to what was intended by the expression. It is evident that all the elements going to make up a fair rate were not included and considered. The situation in hand is not met by denying the company what it wants because it is not good for it. If the rate is just and reasonable, the company may demand it, even though the Commission is of the opinion that the company is making a financial mistake in asking its just dues. People ex rel. D. & H. Co. v. Stevens, 134 App. Div. 99, 118 N. Y. Supp. 969, affirmed 197 N. Y. 1, 90 N. E. 60.

If a reasonable and just rate will be prejudicial to the community, it is unfortunate, but furnishes no reason why the company should be required to render the service at a loss. The rate must be reasonable and fair to the company and to the public; the public must not pay too much nor the company receive too little. While the Commission concludes that all of the tollage and terminal expenses should be considered as a part of the general expenses of the company, it does not result therefrom that the rates charged were unreasonable or unjust. It might well be that if these charges were treated as a general expense of the road, and not charged upon the passenger traffic, nevertheless the company's rates were just and reasonable. The Commission has given too much attention to the benefits which the community in and about New York will receive from lower rates, without regard to the loss which the company will suffer thereby. While the company owes something to the upbuilding of the community, nevertheless the business offered must at least pay a fair return over actual cost. It rested its determination entirely upon an erroneous assumption that the rates were illegal and unfair, because the company had increased its rates, and based its conclusion that the company had not rebutted that presumption upon unsatisfactory reasons The record indicates that, at the time the principal part of the evidence was taken, the use of electric power at the Grand Central Station was something of an experiment, and the actual cost thereof could not accurately be determined, and that the expense of maintaining the terminal was problematical, as it was far from completion, and it was entirely uncertain what rents might be received from others. Those matters can now be determined with reasonable certainty, and it is not just to the public or the company that the decision should rest on mere speculation as to future developments.

The Commission was in error when it determined that all the tollage and the terminal charges must be placed upon the entire road as the expenses of other stations are paid. It may be conceded that, if the company paid a gross sum for rental, it should not be borne entirely by the service in and out of the station. In such a case the rent is constant and is unaffected by the number of passengers. Here there is no fixed rental; the amount to be paid depends entirely upon the number of passengers carried. It must be conceded that, for every commuter on the defendant's line who uses the station, the company is required to pay to others 10.84 cents out of the amount received by it, leaving but about 3.16 cents for its share, while the cost of propulsion is 4.55, without considering the other items which materially affect the cost of service. It would be manifestly for the interest of the company to carry no commuters. In fact, the evidence shows that it is completing another line into New York for the purpose of diverting the commuters and local passengers from the present route in order to avoid the large terminal and tollage charges. It is urged that the New York connection and the relator's use of the Grand Central Station gives to it a certain prestige which it otherwise would not have, and that at least some of the charges on account of the terminal should be borne by the road as a general expense, but not necessarily all of them. The regulation of rates means that each patron of the road shall pay an adequate compensation for the service he receives, and shall not be required to pay for the service furnished to another. It is difficult to see why a passenger traveling from New Haven to Boston should pay more than the service is worth because the commuters from Mt. Vernon to New York are carried by the company at an actual loss. It is not necessary, however, to determine that all of the tollage and terminal charges should be borne by the passenger service. In fact, the company makes no such claim. It is manifest that, if the entire amount paid by the company for tollage and terminal charges on account of each passenger was included in the rate, a much larger rate would be required.

We have seen that the actual cost of tollage, terminal charges, and propulsion actually exceeds the company's rate, making no account of the other elements entering into a just rate. If the passenger service bears its reasonable part of the tollage and terminal charges under the circumstances, the relator's rates are not unreasonable. Evidently the contract as to the tollage makes a sufficient discrimination between the regular and the commuting passenger. The relator is differently situated than any other railroad serving New York City. No other road is required to pay to others from the fare received any such sum as the relator pays. While the Pennsylvania and the New York Central have expensive terminals involving a large expenditure for interest and maintenance, the charge is fixed and is not affected by the number of passengers using the terminal. It is urged that the rates of the relator are in excess of those on many other roads serving the city. But, when figured on a per trip basis, the excess represents a part of a cent for each trip, while it must be conceded that the actual cost to the company for the service is much in excess of what it receives. The

difference between the company's rate and the Commission's rate is about 2½ cents for about 14 miles travel, or about one-sixth of a cent per mile. The Commission was wrong in determining that the question submitted "is not just how many tenths of a cent the rate can be raised or lowered for each mile of travel." That was the vital question in the case and must be disposed of by accurate consideration and not upon broad generalities. For the millions of passengers carried the amount is very large, and that fraction of a cent may be just the difference between a fair rate and an illegal exaction. Comparing the relator with the other roads, and the amount which it actually pays to get its commuters into and out of the station, if their rates are reasonable it follows that those of the relator are not unreasonable. The passenger cannot require the relator to carry him as cheaply as another road can carry a passenger under different circumstances, but can only insist that the relator shall not get an undue profit for the service it renders him. The tollage and terminal charges are material as tending to show that the company is actually suffering a loss by reason of the transportation of each commuter, and for that reason it is entitled to different consideration than other lines which are concededly rendering service at a profit. With them the question is how much profit they shall receive; with the relator the question is how small its loss shall be.

On each one-way passenger the relator pays a tollage of 12.2 cents, and a terminal charge of 6.77 cents, so that it pays to others from each fare 18.97 cents. It is claimed that the relator receives a few cents more than other roads serving New York charge for an equal distance. But, as we have seen, the charges upon other roads are not under the circumstances controlling. The mileage book law of this state is the last legislative determination as to a reasonable charge under ordinary circumstances for transporting a passenger who travels at least 500 miles. The service here is rendered under unusual circumstances which justify a larger charge.

Upon a careful examination of the entire record, it does not appear that the rates fixed by the company are unreasonable or unjust, and it does not appear from the reasons given by the Commission that it has so found. It is confidently claimed that in the immediate future, if not now, the rentals received at the Grand Central Station from others will reduce, if not substantially do away with, the terminal charges. The question is of great importance to a great many people. Those questions can now be determined with quite a degree of certainty. The case is not only of great importance to the people but to the company, and should be disposed of upon the facts as they actually exist at the time the order is made. The company's rates can only be annulled if the circumstances actually existing make them unreasonable and unfair. In annulling the order of the Commission it is better to leave the way open for a new application rather than send the matter back to the Commission for a rehearing. Such course will eliminate from the record many unnecessary and conjectural things and confine the question to the real merits.

The order of the Commission is therefore annulled, without prej-

udice to a new application at any time upon changed conditions with reference to tollage or. terminal charges.   All concur, except HOW-ARD, J., dissenting in opinion in which WOODWARD, J., concurs.

HOWARD, J. (dissenting).   I concur with Mr. Justice KELLOGG in his conclusion that the Public Service Commission, under section 33 of the act creating that Commission, as amended, also under section 49, has power to regulate rates for the public convenience and welfare—commutation rates as well as all other rates.   The plain language of the statute makes the meaning so apparent that there is no opportunity for judicial interpretation.   I dissent, however, from Justice KELLOGG'S conclusion that the increased rates established by the New York, New Haven & Hartford Railroad Company are reasonable.

According to the figures presented by the railroad, commuters, even under the new rates, are carried by the company at an actual loss.   But these figures grow entirely out of the peculiar contract between the New York, New Haven & Hartford Railroad and the New York Central Railroad by which the terminal charges and trackage toll, instead of being fixed positively in a definite sum, are fixed by counting the passengers of all grades traveling over the New York & Harlem road and entering the Grand Central terminal.   It is argued that, because this rent and toll happens to have been fixed in this way, each passenger ought to pay to the company what it costs the company under this contract to take him on as a passenger, plus a reasonable profit. But it seems to me that this conclusion does not necessarily follow. The figures look absolutely convincing at first sight, and the argument, until it is carefully examined, seems sound and looks plausible; but it fails, I think, to stand the test of close scrutiny.

The very fact that under the increased rates the railroad still claims to be losing money on each commuter it carries is a convincing argument that the company itself does not consider and never has considered that the commuters are paying or ought to pay this exorbitant toll and rent, but regards it as a general operating expense to be spread over the entire system.   Their position here that these expenses should be charged against the commuters is evidently only for the purposes of the argument, else, having the right to do so, why did they not raise the fare to a point where there would be a profit rather than a loss? The Public Service Commission has no right to fix rates at a point where the railroad will suffer a loss.   Such rates would not be "just and reasonable rates"; such rates would deprive the railroad of its property "without due process of law."   This is axiomatic, and a mere statement to the court, without the citation of authorities, that the rates have been fixed at a point where the company is losing money on each passenger carried will result in instant relief.   All this the relator knows well, and yet it has fixed its new rates at a point, so it asks the court to believe, where it continues to lose money.   Why is the railroad willing to do business at a loss?   Why was it ever willing; there never having been a law to force it to do so?   The answer is apparent.   The company regards the toll and rent as general operat-

ing expenses; so regarded, it does not suffer loss but makes money, for in the aggregate the contract results in enormous profit to the company.

It can easily be seen that the privilege of having a terminus to its road in the heart of New York City was of transcendent importance to the New York & New Haven Railroad when it first entered into this contract. It probably paid more than a fair and reasonable price for this privilege; perhaps it amounted to a bonus. But this right inured vastly to the entire New York & New Haven system; it profited the New Haven end as much as the New York end. It redounded immeasurably to the total value of the railroad property as well as to the total revenue. Getting the New York terminus was vital to this railroad; it leaped, by this stroke of diplomacy, from obscurity and insignificance into great prominence and consequence. It opened up and perfected a route between the most populous centers of America—New York City and New England. The New York & New Haven road, looking shrewdly into the future, was undoubtedly willing to submit to any terms, even the most unreasonable ones, if necessary, to secure this inestimable right. But this right so clearly appertains to and affects and enhances the value of the entire railroad that this toll and rent should unquestionably, it seems to me, be charged, not against the Westchester communities, not against the commuters, the ones least able to pay, but against the entire system.

Suppose the contracting railroads had agreed that the trackage tollage and terminal charges be fixed exclusively by counting the number of commuters who travel over the few miles of road leased from the New York & Harlem people and enter the terminal, could it then be argued that these commuters must bear the entire burden? If these contracting railroads have made a bargain between themselves which, if permitted to operate as they intend it to operate, bears hard upon a certain class of travelers, it then becomes imperatively the duty of the Public Service Commission to step in and regulate the rates so that they shall not become oppressive to that class of passengers hit by this private contract. I have no doubt, under section 49 of the Public Service Law, that the Commission has power to modify this contract, if necessary, or cause the execution of a new contract, so that these trackage and terminal expenses shall be charged to the general operating expenses of the New York & New Haven road and not against the commuters or the passenger traffic.

There are many phases of this controversy which might be discussed, but, as I view the situation, no further discussion is necessary, for the whole subject narrows down to the question whether the trackage and terminal expenses should be charged against the passengers who go over the New York & Harlem road and enter the terminal, or be charged to general operating expenses. Having arrived at the conclusion that these expenses should be distributed over the entire system, the discussion ends.

It is scarcely necessary to add emphasis to what the chairman of the Public Service Commission has said concerning the importance of this determination to the residents and communities along the New York

& Harlem road. Public convenience, public happiness, public health, and the cause of humanity require this court to hesitate to render a decision which will cast a lasting blight upon the villages and communities and citizens of Westchester county. Unless the law and the equity of the case are positively on the side of the railroad, our determination should uphold the old rates.

The finding of the Public Service Commission should be affirmed, with costs.

___

(159 App. Div. 546)

PEOPLE ex rel. NEW YORK CENT. & H. R. R. CO. v. PUBLIC SERVICE COMMISSION FOR SECOND DIST. et al.

(Supreme Court, Appellate Division, Third Department.   January 14, 1914.)

1. CARRIERS (§ 10*)—FARES—REGULATION—PUBLIC SERVICE COMMISSION—JURISDICTION.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

2. CARRIERS (§ 10*)—PASSENGER RATES—REGULATION—PROCEEDINGS BEFORE RAILROAD COMMISSION—BURDEN OF PROOF.

In a proceeding before the Public Service Commission to have certain increased passenger rates annulled as unreasonable, the fact that the carrier had for a long series of years operated under an established lower rate did not raise a prima facie case that the increased rates were unreasonable so as to place on it the burden of proof that they were reasonable and that it was justified in raising the rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

3. CARRIERS (§ 10*)—RATES—INCREASE—REASONABLENESS.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

4. CARRIERS (§ 10*)—RATES—DETERMINATION—MERITS.

In proceedings before the Public Service Commission to annul increased passenger rates, adopted and enforced by a carrier in its commutation suburban service, the carrier was entitled to have the Commission pass on the reasonableness of the increased rates on the merits in accordance with the facts as they then existed, and it was improper for the Commission to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

145 N.Y.S.—33