GEORGIA PUBLIC SERVICE COMMISSION *et al. v.* ATLANTA AND WEST POINT RAILROAD COMPANY.

1. Under the act creating the Railroad Commission of Georgia (Acts 1878-9, p. 125; Civil Code (1910), §§ 2630, 2631), now the Georgia Public-Service Commission (Acts 1922, p. 143; Park's Code Supp. 1926, and Michie's Georgia Code 1926, § 2670(a) et seq.), the commission has the power to determine what are just and reasonable rates and charges for transportation of passengers on each of the railroads doing business in this State.

2. Maximum intrastate passenger rates were fixed by the Railroad Commission of Georgia, effective since September 1, 1920, at 3.6 cents per mile on railroads doing business in this State. This rate is prima facie reasonable and just.

3. "State regulation, through a public-service commission, requiring a carrier to maintain commutation service between points within the State, and fixing rates therefor, which are less than the intrastate rate lawfully established for one-way intrastate travel in general, does not deprive the carrier of due process of law when the service so regulated was established by the carrier voluntarily and the rates fixed by the State are reasonable."

4. But where the Railroad Commission of this State established commutation rates between points on the line of railroad of a carrier in this State, and not between the points where commutation rates were already voluntarily established by the carrier, and the carrier was required to "establish commutation passenger fares" between certain points "at a rate not higher per mile per passenger than commutation rates now in

Carriers, 10 C. J. p. 406, n. 1; p. 662, n. 70; p. 663, n. 72; p. 664, n. 99; p. 665, n. 17; p. 666, n. 20; p. 667, n. 35; p. 669, n. 67; p. 671, n. 92; p. 676, n. 38.

Constitutional Law, 12 C. J. p. 1169, n. 82; p. 1170, n. 84; p. 1268, n. 24, 25; p. 1271, n. 97 New.

effect between" the points originally named by the carrier; and where, on the trial of a cause seeking to enjoin the enforcement of the order of the commission, on the ground that such rates deprived the carrier of due process of law and the equal protection of the laws, the undisputed evidence for the plaintiff showed that the rates were below the cost of transportation and were unremunerative, the trial court did not err in granting a permanent injunction against the enforcement of the order of the commission. Such rates deprived the carrier of due process of law and the equal protection of the laws.

5. Where a railroad corporation voluntarily establishes commutation rates, less than the intrastate mileage rates fixed by the State commission, between a large city at one terminus of its line and a suburban town near such city, the establishment of such commutation rates on account of local conditions can not be held to be the establishment of a "general policy" to put in commutation rates between all the towns on the line of such railroad where conditions are different.

No. 5651. SEPTEMBER 21, 1927.

Equitable petition. Before Judge Pomeroy. Fulton superior court. September 1, 1926.

*W. E. Watkins* and *H. A. Hall,* for plaintiff in error.

*Dorsey, Howell & Heyman,* contra.

HILL, J. In the year 1922 certain citizens of Newnan, Georgia, filed a petition with the Georgia Railroad Commission, since being changed to the Georgia Public-Service Commission (Acts 1922, p. 143), to require the Atlanta & West Point Railroad Company to establish commutation rates or fares between the Cities of Atlanta and Newnan, Georgia, and intermediate points. After a hearing on the application the commission passed the following order: "Upon consideration of the record in the above-stated case, and of the evidence, and argument submitted at the hearing had thereon, it is ordered, that, effective on and after August 1, 1922, and until the further order of the commission, the Atlanta & West Point Railroad Co. shall establish commutation passenger fares between Atlanta and Newnan, Georgia, and between Atlanta and intermediate stations between Palmetto and Newnan, at a rate not higher per mile per passenger than commutation rates now in effect between Atlanta and Palmetto, Georgia; it is ordered further, that tickets or books of commutation fares provided for in this order shall be under the same conditions and carry the same privileges as now in effect between Atlanta and Palmetto, Georgia." Thereupon the Atlanta & West Point Railroad Co. filed its equitable petition in the superior court of Fulton County, against the Rail-

road Commission of Georgia and the individual members composing the commission, alleging that the order was invalid, null and void, for various reasons set forth in the petition, and that the order if enforced would have the effect of depriving the plaintiff of its property without due process of law, and of the equal protection of the law, as guaranteed both by the constitution of the United States and by the constitution of the State of Georgia; and praying that the order be vacated and set aside, and that the Railroad Commission of Georgia and each of its members, its attorney, and all others acting under it be enjoined from making any effort or doing any act seeking to enforce the order, and that a perpetual injunction be granted against taking any step or action to compel plaintiff to carry out the regulations of said order. The petition alleged in substance the following: The plaintiff operates a railroad from Atlanta to West Point, Georgia; and the cities of West Point, LaGrange, and Newnan are junction points with other railroads; both LaGrange and Newnan are large manufacturing points and conduct extensive mercantile businesses, wholesale and retail. The maximum charge for carrying passengers on plaintiff's railroad, as established by the Railroad Commission of Georgia, which had been in effect since August, 1920, was 3.6 cents per mile; and plaintiff had been charging this rate, except that it did issue commutation tickets at points between Palmetto and Atlanta for a much lower rate, which rate plaintiff had continued to the time of filing this petition. The circumstances under which this rate was originally put in effect are set forth. The sale of the commutation books has been attended with considerable loss to the plaintiff. It had operated a special accommodation train between Palmetto and Atlanta, but its operation was attended with such loss that it was discontinued. For a time the train was operated between College Park and Atlanta, but the loss from this operation had compelled its discontinuance. Certain persons engaged in business in Atlanta, on the faith of the fact that such special train would be continued, and on account of the commutation rates, had made Palmetto and other points between that town and Atlanta their homes; and plaintiff was therefore permitted, in the exercise of good faith, to continue the sale of commutation books. These commutation rates have resulted in a heavy loss to plaintiff, the extent of which is alleged. Various

grounds are alleged as to why the order of the commission was invalid.

On the hearing the evidence for the plaintiff consisted of affidavits of W. H. Smith, formerly its comptroller, Chas. A. Wickersham, its president and general manager, W. H. Vincent, its present comptroller, and J. A. Higgins, its assistant general passenger agent. Affidavits were offered in evidence by the Georgia Public Service Commission, of George J. Martin, F. D. Cole, E. M. Cole, R. O. Jones, and R. H. North, who testified, in effect, that if commutation rates were put into effect between Newnan and Atlanta, certain residents of Newnan would avail themselves of such commutation rates, and that the number would probably increase. The evidence on behalf of the plaintiff was substantially in support of the petition, in effect showing that there was no necessity for the commutation rates between Newnan and Atlanta, such as existed in large cities like New York and Chicago, where there is a great suburban population doing business in the cities, and which justifies the operation of special trains for their accommodation. The evidence of W. H. Vincent tended to show that it cost the plaintiff 2.81 cents per mile, that the revenue per passenger-mile on commutation fares for the average of four years was .99 of one cent, and that the actual loss per mile of carrying each passenger who might ride on a commutation ticket was 1.83 cents. Certain tables attached to the affidavit of W. H. Vincent tended to show that Newnan is almost half way between Atlanta and West Point, and that the intrastate passengers carried between Atlanta and Newnan and intermediate points comprise about fifty per cent. of all the intrastate passengers carried, and about 40 per cent. of the revenue received from intrastate passengers. We quote part of the affidavit of W. H. Vincent, as follows: "To permit the sale of commutation tickets between Atlanta and Newnan would probably cost the railroad company to haul fifty per cent. of its passengers at a heavy loss. . . Since this order of the Georgia Public-Service Commission there has been constructed between Atlanta and Newnan a concrete public highway. A great many people use this highway for travel between Atlanta and Newnan, instead of using train service. . . Conditions with reference to the necessity for railroad transportation of the population in large cities, in order to avoid their living in congested

districts, have greatly changed. A number of years ago, before the general use of automobiles and electric street-car service, it was necessary for people who wished to do business in a large city, and not live within the thickly-settled sections of the cities, to locate along the railroads entering such city. As a result of this there was quite a demand for a specially cheap rate for the people who worked in the city and lived in the outlying towns and suburbs of the city. In recent years this necessity has been practically eliminated, especially in cities like Atlanta, where there is ample space all around the city for the settlement of people in homes in sections not closely built up. This change has been caused by the building of electric trolley-lines enabling people to live a few miles from the center of the city and to reach their homes by trolley or electric service, by great improvements in the roads, and the use of automobiles in going to and from their homes to and from their places of business, the use of electric car-lines operating regular schedules between outlying districts and the center of the city. Because of these facilities that enable suburbanites to reach their places of business, the city of Atlanta has extended in every direction, and particularly in those sections not served by railroads. One of the reasons for this last situation is the fact that where you find railroads you find industrial development, and the erection of industries has a tendency to retard the use of such sections for residential purposes."

The court granted the injunction as prayed for, and the defendants excepted.

The question to be determined is whether the order of the Railroad Commission of Georgia, now the Georgia Public-Service Commission (Acts 1922, p. 143), as set out in the foregoing statement, is invalid for any reason suggested under the pleadings and evidence. "The power to determine what are just and reasonable rates and charges is vested exclusively in the commission; and the commissioners shall make reasonable and just rates of freight and passenger tariffs, to be observed by all railroad companies doing business in this State, on the railroads thereof," etc. Civil Code (1910), § 2630. "The Public-Service Commissioners are required to make for each of the railroad corporations doing business in this State, as soon as practicable, a schedule of just and reasonable rates of charges for transportation of passengers and

freights and cars on each of said railroads," etc. § 2631. The question arises, what are reasonable and just passenger rates on intrastate commerce within the State of Georgia. Under the transportation act of 1920 the Interstate-Commerce Commission fixed passenger rates at 3.6 cents per mile. See subject of "increased rates," 58 I. C. C. R. 220. It may be stated in passing that an examination of this report shows that the railroad commissions of every State in the Union, and various mercantile and industrial bureaus, were represented at the hearing before the rate was so fixed. It appears that John T. Boifeuillet appeared on behalf of the Railroad Commission of Georgia, and H. T. Moore, William A. Wimbish, and W. H. Ellis appeared on behalf of the Atlanta Freight Bureau. By authority, therefore, of the Interstate Commerce Commission the rate of 3.6 cents per mile was made effective as to intrastate passenger rates. See Wisconsin case, 59 I. C. C. R. 391. This ruling was upheld in Railroad Commission of Wisconsin v. C., B. & Q. R., 257 U. S. 563 (42 Sup. Ct. 232, 22 A. L. R. 1086). The decision fixing intrastate passenger rates at 3.6 cents per mile seems to have been acquiesced in by the Railroad Commission of Georgia, and passenger rates in this State have been fixed at 3.6 cents per mile since September 1, 1920. Paragraph 2 of the defendants' answer in the present case admits certain allegations in the petition, "except that the maximum rate of 3.6 cents per mile on intrastate passenger traffic over said road did not go into effect on August 25, 1920, but on September 1, 1920." It therefore appears that a charge of 3.6 cents a mile per passenger has been fixed as a reasonable and just rate to be charged by railroads in this State, in order to furnish carriers reasonable and just rates for carrying passengers. Common carriers are entitled to just and reasonable compensation on each class of business transported by them.

In Northern Pac. Ry. Co. v. N. D., 236 U. S. 585 (35 Sup. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148), it was held: "The cost of the transportation of a particular commodity, which must be considered when determining whether the maximum intrastate rates fixed by the State for the carriage of such commodity are adequate or confiscatory, includes all the outlays which pertain to such transportation, there being no basis for distinguishing in this respect between so-called 'out of pocket cost,' or 'actual' ex-

penses, and other outlays which are none the less actually made because they are applicable to all traffic, instead of being exclusively incurred in the traffic in question. . . A statute may not compel a carrier to establish a rate upon a particular commodity which is less than reasonable, in order to build up a local enterprise. . . The maximum intrastate rates fixed by N. D. Laws, 1907, ch. 51, for the transportation of coal in car-load lots, are confiscatory and deny the carrier the due process of law guaranteed by U. S. constitution, 14th amendment, where, taking into account the entire traffic to which such rates are applied, they compel the carrier to transport the commodity for less than cost, or without substantial compensation in addition to cost, although the return to the carrier from its entire intrastate operations may be adequate." In the opinion Mr. Justice Hughes, among other things, said: "But, broad as is the power of regulation, the State does not enjoy the freedom of an owner. The fact that the property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the carrier has expressly or impliedly assumed. If it has held itself out as a carrier of passengers only, it can not be compelled to carry freight. As a carrier for hire, it can not be required to carry passengers or goods gratuitously. The case would not be altered by the assertion that the public interest demanded such carriage. The public interest can not be invoked as a justification for demands which pass the limits of reasonable protection, and seek to impose upon the carrier and its property burdens that are not incident to its engagement. In such a case it would be no answer to say that the carrier obtains from its entire intrastate business a return as to the sufficiency of which in the aggregate it is not entitled to complain." And see Norfolk & Western Ry. Co. *v.* Conley, 236 U. S. 605 (35 Sup. Ct. 437, 59 L. ed. 745).

It has been held by the Supreme Court of the United States that in considering what is a fair return for the hauling of intrastate passengers a State commission is not permitted to take into consideration the returns received by the carrier from interstate business. Smyth *v.* Ames, 169 U. S. 466 (18 Sup. Ct. 418, 42

L. ed. 819). It has also been held that rates must be based on the fair valuation of the property devoted to public use, including the cost of construction, the value of stocks and bonds, earning capacity and operating expenses. Wood v. Vandalia R. Co., 231 U. S. 1 (34 Sup. Ct. 7, 58 L. ed. 100); So. Iowa Elec. Co. v. Chariton, 255 U. S. 539, 542 (41 Sup. Ct. 400, 65 L. ed. 764, 775); Vandalia R. Co. v. Schnull, 255 U. S. 113, 118 (41 Sup. Ct. 324, 65 L. ed. 539, 543); Brooks-Scanlon Co. v. R. Com., 251 U. S. 396 (40 Sup. Ct. 183, 64 L. ed. 323); Smyth v. Ames, supra; Lake Shore &c. R. Co. v. Smith, 173 U. S. 684 (19 Sup. Ct. 565, 43 L. ed. 858). In the Schnull case, supra, headnote 1 is as follows: "A State may not segregate a class of traffic and compel a carrier to transport it in intrastate commerce at less than cost, or without a substantial compensation, although the return by the carrier from its entire intrastate operations may be adequate." The law creating the Georgia Public-Service Commission has not in express terms conferred power upon the commission to establish commutation rates as such. We do not mean to hold, however, that the Georgia Public-Service Commission, may not, under the law, promulgate commutation rates, in a proper case, on intrastate railroads doing business in this State, provided such rates are reasonable and just. The power of the commission in establishing rates is that conferred by the Civil Code, the sections of which are set out above, and the amendments thereto; and that authority is limited to fixing rates which are reasonable and just for the class of service to be rendered, and which will afford a reasonable return on the investment of the carrier, after paying the cost for rendering such service. The Railroad Commission of Georgia ordered the Atlanta & West Point Railroad Co., in the instant case, to render a passenger service between Newnan and Atlanta and intermediate points on a basis of return which, according to the undisputed evidence, is less than the cost of such service to the traveling public; and therefore we are of the opinion that the court below did not err, under the pleadings and the evidence, in enjoining the commission from enforcing such order. We are of the opinion that the order is violative of the due-process clauses of the State and Federal constitutions, which prohibit the taking of property of a citizen without due process of law, and that it denies the carrier the equal protection of the law.

In Penn. R. Co. *v.* Towers, 245 U. S. 6 (38 Sup. Ct. 2, 62 L. ed.    , L. R. A. 1918C, 475), the Supreme Court of the United States held: "Whether the statutes of Maryland intended to authorize the Public-Service Commission to revise intrastate commutation rates, when such rates have already been established by voluntary action of the railroad company, is a question of State law concerning which the conclusion of the Court of Appeals of Maryland binds this court upon a writ of error to review its judgment. State regulation, through a public-service commission, requiring a carrier to maintain commutation service between points within the State, and fixing rates therefor which are less than the intrastate rate lawfully established for one-way intrastate travel in general, does not deprive the carrier of due process of law when the service so regulated was established by the carrier voluntarily and the rates fixed by the State are reasonable. Lake Shore & Michigan Southern Ry. Co. *v.* Smith, 173 U. S. 684 [supra], is distinguished, and the views expressed in that case which are inconsistent with the decision in this one are disapproved." The Towers case, supra, was an action in the circuit court of Baltimore, Maryland, to enjoin the Public-Service Commission of Maryland from enforcing an order to sell commutation tickets at certain rates specified. The injunction was refused, and on appeal the Court of Appeals of Maryland affirmed the decree, and held that, although the order fixing the rates declared the same to be in force for ten years, there should be reserved to the railroad company the right to apply to the commission, after the lapse of a reasonable time, for a rescission or modification of its order if experience demonstrated that the revenue derived under the tariff as established by the commission was not properly compensatory for the services performed. The order of the commission required the Pennsylvania Railroad Company, lessee of the Northern Central Railway, to sell tickets for the transportation of the passengers between Baltimore and Parkton within the State of Maryland on the line of the Northern Central Railway. A table appeared in the opinion of the Court of Appeals, showing the relative rates under the former schedule and the new order of the Public-Service Commission. The order of the commission was attacked in the Towers case, on the ground that its effect was to take the property of the railroad company without due process

of law, contrary to the 14th amendment to the constitution of the United States; and it was also alleged, in the bill attacking the order, that if enforced it would work a discrimination against interstate travel in favor of travel within the State, and that it was otherwise unreasonable and void. It is stated in the opinion delivered by Mr. Justice Day that the Court of Appeals stated the question to be whether it is within the power of the Public-Service Commission to require the establishment of a schedule of commutation rates by the railroad company, not where no such rates had theretofore been established, but where a new system of commutation rates had been proposed by the railroad company and submitted to the commission.

Mr. Justice Day further said: "Whether commutation rates should be established was declared to be a question of policy to be decided by the company. The court found authority in the commission, under the statutes of Maryland, to revise commutation rates *where such rates had already been established by the action of the company.* [Italics ours.] We must accept this definition of authority in the commission, so far as the State law is concerned, and direct our inquiry to the Federal question presented. The question, as counsel for plaintiff in error states it, is whether a State legislature, either directly or through the medium of a public-service commission, under the guise of regulating commerce, may compel carriers engaged in both interstate and intrastate commerce to establish and maintain intrastate rates at less than both the interstate and intrastate standard and legally established maxima. It is asserted that there is no constitutional authority to compel railroad companies to continue the sale of commutation or special class tickets at rates less than the legally established standard or normal one-way single passenger fare upon terms more favorable than those extended to the single one-way traveler. To maintain this proposition plaintiff in error relies upon and quotes largely from the opinion of this court in Lake Shore & Michigan Southern Ry. Co. *v.* Smith, 173 U. S. 684 [supra]. In that case a majority of this court held a statute of the State of Michigan to be invalid. A previous statute of the State had fixed a maximum passenger rate of three cents per mile. The statute in controversy required the issuing of mileage books for a thousand miles, good for two years, at a less rate. This

court held that a maximum rate for passengers having been established, that rate was to be regarded as the reasonable compensation for the service, and that the fixing of the less rate to particular individuals was an arbitrary exercise of legislative power and an unconstitutional interference with the business of the carrier, the effect of which was to violate the provisions of the fourteenth amendment to the Federal constitution, by depriving the railroad company of its property without due process of law and denying to it the equal protection of the law. The Lake Shore case did not involve, as does the present one, the power of a State commission to fix intrastate rates for commutation tickets where such rates had already been put in force by the railroad company of its own volition; and we confine ourselves to the precise question presented in this case, which involves the supervision of commutation rates when rates of that character have been voluntarily established by the carrier. The rates here involved are wholly intrastate. The power of the States to fix reasonable intrastate rates is too well settled at this time to need further discussion or a citation of authority to support it. In Interstate Commerce Commission *v.* Baltimore & Ohio R. R. Co., 145 U. S. 263 [12 Sup. Ct. 844, 36 L. ed. 699], this court held that a 'party-rate ticket' for the transportation of ten or more persons at a less rate than that charged a single individual did not make a discrimination against an individual charged more for the same service, or amount to an unjust or unreasonable discrimination within the meaning of the act to regulate commerce. In the course of the opinion the right to issue tickets at reduced rates good for limited periods upon the principle of commutation was fully recognized. See pp. 277, 278, 279, 280. Having the conceded authority to regulate intrastate rates, we preceive no reason why such power may not be exercised through duly authorized commissions, and rates fixed with reference to the particular character of the service to be rendered. In Norfolk & Western Ry. Co. *v.* West Virginia, 236 U. S. 605, 608 [supra], after making reference to Northern Pacific Ry. Co. *v.* North Dakota, 236 U. S. 585 [supra], this court said: 'It was recognized [in the North Dakota case] that the State has a broad field for the exercise of its discretion in prescribing reasonable rates for common carriers within its jurisdiction; that it is not necessary that there should be uniform rates or the same

percentage of profit on every sort of business; and that there is abundant room for reasonable classification and the adaptation of rates to various groups of services.'

"That the State may fix maximum rates governing one-way passenger travel is conceded. Having the general authority to fix rates of a reasonable nature, we can see no good reason for denying to the State the power to exercise this authority in such manner as to fix rates for special services, different from those charged for the general service. In our opinion the rate for a single fare for passengers generally may be varied so as to fit the particular and different service, which involves, as do commutation rates, the disposition of tickets to passengers who have a peculiar relation to the service. The service rendered in selling a ticket for one continuous trip is quite different from that involved in disposing of commutation tickets where a single ticket may cover 100 rides or more within a limited period. The labor and cost of making such tickets as well as the cost of selling them is less than is involved in making and selling single tickets for single journeys to one-way passengers. The service rendered the commuter, carrying little baggage and riding many times on a single ticket for short distances, is of a special character, and differs from that given the single-way passenger. It is well known that there have grown up near to all the large cities of this country suburban communities which require this peculiar service, and as to which the railroad themselves, as in this instance, established commutation rates. After such recognition of the propriety and necessity of such service, we see no reason why a State may not regulate the matter, keeping within the limitation of reasonableness. On the strength of these commutation tariffs, it is a fact of public history that thousands of persons have acquired homes in city suburbs and near-by towns in reliance upon this action of the carriers in fixing special rates and furnishing particular accommodations suitable to the traffic. This fact has been recognized by the courts of the country, by the Interstate Commerce Commission, and quite generally by the railroad commissions of the States. The question of the power of the Public-Service Commission of the State of New York in this respect was before the Appellate Division of the Supreme Court of that State in People ex rel. New York, New Haven & Hartford R. R. Co. v. Public-Service Commission, 159

App. Div. Rep., Supreme Court, 531 [145 N. Y. Supp. 503]. In that case it was said: 'Subdivision 4 of section 33 of the Public-Service Commissions Law (Consol. Laws, chap. 48 [Laws of 1910, chap. 480], as amd. by Laws of 1911, chap. 546) empowers the commission to fix reasonable and just rates for such service. It is urged, however, that the statute is invalid under the rule of Lake Shore &c. R. Co. *v.* Smith (173 U. S. 684). In that case the statutes of Michigan had fixed a maximum passenger rate at three cents per mile. A subsequent enactment required the issuing of mileage books for 1000 miles, good for two years, at a less rate. The court held that having fixed a uniform maximum rate as to all passengers, such rate was the reasonable compensation for the service, and that the fixing of a less rate to particular individuals was an unreasonable and arbitrary exercise of legislative power; that it was not for the convenience of the public and thus within the police power, but was for the convenience of certain individuals who were permitted to travel upon the railroads for less than the reasonable rate prescribed by law; that the law was, therefore, in violation of the fourteenth amendment of the Federal constitution, in depriving the company of its property without due process of law and by depriving it of the equal protection of the laws." After citing and quoting from a number of other cases, Mr. Justice Day concludes by saying, "The reasoning of these decisions is sound and involves no violation of the Federal constitution. True it is that it may not be possible to reconcile these views with all that is said in the opinion delivered for the majority of the court in the case of Lake Shore & Michigan Southern Ry. Co. *v.* Smith, supra. The views therein expressed, which are inconsistent with the right of the States to fix reasonable commutation fares when the carrier has itself established fares for such service, must be regarded as overruled by the decision in this case."

It will be observed that the Supreme Court, in discussing the Maryland case, stated that whether commutation rates should be established was declared by the Court of Appeals of Maryland to be a question of *policy* to be decided by the company, not where no such rates had theretofore been established, but where a new system of commutation rates had been proposed by the railroad company itself and submitted to the State commission for its approval. In such a case as that, the Supreme Court held that under

the statutes of Maryland the commission could revise commutation rates where such rates had been established by the railroad company itself. The question, therefore, arises in the instant case, where the railroad has voluntarily put into effect certain commutation rates between Atlanta and Palmetto on its line of railroad, whether such promulgation of commutation rates established such a general *policy* of commutation rates which would extend to all other points on its road. We do not think so, and are of the opinion that such action on the part of the railroad company would not give the Georgia Railroad Commission authority to extend that policy and to promulgate commutation rates, not just and reasonable, between points other than those where the railroad itself established commutation rates. The Supreme Court of the United States, in discussing the Towers case, supra, refers to the matter of *discrimination* as the result of the issuance of excursion tickets, party-rate tickets, and commutation tickets, and says in effect that, while there may be an element of discrimination from the promulgation and sale of such tickets, it is not an *unjust discrimination.* The court points out the fact that commutation service is a *special service,* and says: "The service rendered the commuter carrying little baggage and riding many times on a single ticket for *short distances* (italics ours), is of a special character, and differs from that given the single-way passenger." The Civil Code (1910), § 2629, declares that "If any railroad corporation as aforesaid shall make any unjust discrimination in its rates or charges of toll or any compensation for the transportation of passengers or freights of any description, or for the use and transportation of any railroad car upon its said road, . . the same shall be deemed guilty of having violated the provisions of this article, and, upon conviction thereof, shall be dealt with as hereinafter provided." It will be observed that it is *unjust discriminations* which are forbidden. It is not every discrimination which is, in legal contemplation, unjust. It has been held that a railroad corporation, under the foregoing section of the Code, can not lawfully demand of one passenger more fare for his transportation from one station to another upon its line than it is in the habit, *under like conditions and circumstances,* of charging others for the same service. *Phillips* v. *Southern Ry. Co.,* 114 *Ga.* 284 (40 S. E. 268). That the railroad has voluntarily put in commutation rates between

Palmetto and Atlanta does not, by mere reason of that fact, make it *unjust* discrimination because there is no commutation service or rates between Newnan and Atlanta, Newnan being thirteen miles further south from Atlanta than Palmetto. It is insisted by plaintiffs in error that there are reasons why the commutation rates already in existence between Palmetto and Atlanta must be continued until they are changed in some manner provided by law. Those rates are in favor of people who have located in Palmetto on the faith of the commutation rates, and good faith on its part requires that they should continue to enjoy those rates; that under rule 14 of the Railroad Commission, the railroad, having once established such rates, can not discontinue the same except with the consent of the commission, or possibly in the absence of such consent, by instituting legal proceedings to discontinue such rates. Whether all this is so is not now for decision. We reach the conclusion that the circumstances surrounding the towns which already have commutation rates are different from those surrounding Newnan and the points between Newnan and Palmetto. So the order of the Public-Service Commission can not be sustained on the ground that not to promulgate the commutation rates would be to sanction an unjust discrimination in favor of the people of Palmetto, and adjacent territory, as against Newnan and other towns.

2. The evidence on the vital issue involved is undisputed. Certain of this evidence tends to show that commutation rates between Palmetto and Atlanta were voluntarily established by the railroad company with the view of building up a suburban traffic between those points. Special trains were operated for a while between those points, but the loss from their operation was so great that they were discontinued, and then for a short while they were operated between College Park and Atlanta. This service was also discontinued for the same reason, viz., that it was rendered at a heavy loss. But, while this was so, in order to keep faith with the people of Palmetto and the neighboring territory, the commutation rates between the two points named were continued in force. The evidence shows without controversy that for the month of June, 1925, the total amount received in the sale of commutation books was $622.56. For the same month of June, 1926, the sale of books amounted to $522.56. The entire number of commutation pas-

sengers hauled for those two months was 2950 for June, 1925; and 2562 for June, 1926. The total number of commutation books sold for five months ending May 31, 1926, was 236, or an average of 47-1/5 for each month. In other words there were only 47 persons holding commutation books entitling them to ride on commutation rates between Atlanta, College Park, Union City, Fairburn, and Palmetto. The evidence for the carrier tended to show that passengers, under the commutation rates, were carried at a loss by the railroad. We have not set out in detail the evidence, but it is undisputed that the commutation rates as fixed by the Georgia Public-Service Commission would entail loss upon the carrier for each passenger who would be transported between Newnan and Atlanta. Therefore we reach the conclusion that the court below did not err in permanently enjoining the Georgia Public-Service Commission, and each of its members, from enforcing the commutation rates promulgated by it. To enforce the order would deny the carrier due process of law and the equal protection of the laws.

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Atkinson, J., who dissent from the ruling in the fourth headnote.*

HINES, J., concurs in the result.