1. "Bills of exception shall be tendered to the judge who presided in the cause within 20 days from the date of the decision complained of." Ga. L. 1946, pp. 726, 734; Code (Ann. Supp.), § 6-902. This 20 days' limitation of time within which to tender is applicable to exceptions pendente lite. Ga. L. 1946, pp. 726, 738; Code (Ann. Supp.), § 6-905. The ruling here complained of is a judgment overruling a motion to dismiss the petition, which was rendered February 23, 1948. The exceptions pendente lite were tendered March 26, 1948, and the main bill of exceptions was tendered April 8, 1948. It follows that neither exception was tendered in time to require a ruling on the exceptions pendente lite, and, therefore, they can not be considered by this court.
2. The exceptions to the rulings on the special demurrers are not argued and, hence, are abandoned and will not be here ruled upon.
3. The exceptions to the rulings on objections to the admissibility of evidence are too incomplete to present any question for decision by the *Page 833 
Supreme Court, in that the evidence objected to is not specified, nor are the grounds of the objections made at the time the evidence was offered set forth.
4. The petition of Georgia Hotel Association to intervene, in so far as it purports to allege any interest of the intervenor in the litigation, merely alleges, "Now comes Georgia Hotel Association on behalf of its member hotels," and was properly disallowed because no interest of the intervenor is shown.
5. Utility rate making is legislative in nature, and the power to make such rates in this State is by the Constitution and laws vested exclusively in the Georgia Public Service Commission.
6. While courts of equity have and can exercise no jurisdiction to make public-utility rates, yet they do have jurisdiction in all cases properly brought before them to render judgments enjoining confiscatory rates, thus preventing impingement of the constitutional rights of public-utility companies. And where it is shown that utility rates fixed by the Public Service Commission are confiscatory and, therefore, result in taking the private property of a public-utility company for public use without due process, a court of equity will not hesitate to take judicial action and enjoin the enforcement of such confiscatory rates.
7. While the order of the Public Service Commission fixing rates is presumed to be valid, and the burden rests upon the telephone company, in attacking that order, to carry the burden of rebutting this presumption with evidence which clearly shows the order to be invalid; yet where, as here, the uncontradicted evidence shows confiscation, the court did not err in granting an interlocutory injunction prohibiting the commission from putting that confiscatory order into operation and from interfering with the action of the utility company in collecting rates sufficient to avoid confiscation.
8. Although a court of equity can not make utility rates, such a court can, in the exercise of its jurisdiction, attach to the judgment enjoining the confiscatory rates a condition that the public-utility company may not collect rates that will produce revenue in excess of a stated amount which in the judgment of the court is the amount necessary to avoid confiscation. Where the rate order is enjoined, the utility company could fix its rates until reasonable rates are fixed by the Public Service Commission.
9. But where, as here, it is conceded by all parties to the suit that the telephone company must have additional revenue in the amount of $3,715,000 per year to avoid confiscation, it was error for the trial court to attach as a condition to its injunction against confiscatory rates that the utility company not collect rates that will produce additional revenue in excess of $360,765. The least maximum of additional revenue that such condition can allow is the full amount shown to be necessary to avoid confiscation.
 Nos. 16241, 16248, 16249. JULY 15, 1948. REHEARING DENIED JULY 28, 1948.
Jenkins, Chief Justice, and Atkinson and Candler, Justices, being disqualified, Judges Knox, George S. Carpenter, and Sloan were designated to preside in their places. Justice Bell, being ill, Judge A. M. Anderson was designated to preside in his place.
 STATEMENT OF FACTS BY DUCKWORTH, PRESIDING JUSTICE.
On January 30, 1948, Southern Bell Telephone and Telegraph Company filed a petition in the Superior Court of Fulton County against the Georgia Public Service Commission and Walter R. McDonald, Chairman, Matt L. McWhorter, Allen Chappell, Perry T. Knight, and James A. Perry, composing the membership of the same, seeking to enjoin the defendants from interfering with the petitioner, hereinafter called the company, or obstructing it from placing into effect a schedule of rates attached to the petition and marked Exhibit "B", which would meet the emergency needs of the company to avoid confiscation. It was alleged that the rates fixed by the commission by its order of January 23, 1948, were wholly inadequate and confiscatory, and that if the company be required to operate under such rates, its property would be daily confiscated and taken without due process of law in violation of article 1, section 1, paragraph 3 of the Constitution of Georgia and of the 14th amendment to the Constitution of the United States. The petition prayed: that the court determine and decree that the company had the constitutional right to charge its customers at least an amount which would be produced by the schedule of rates shown by Exhibit "B", and that the commission be enjoined form obstructing the company in putting into force immediately the said rates and from imposing or seeking to impose any penalties, civil or criminal, upon the petitioner or any of its officers or representatives in virtue of the petitioner putting into effect the said schedule of rates, and from seeking further to maintain in force or effect the rate schedule heretofore ordered by the commission on January 23, 1948, or any schedule of rates inconsistent with the schedule of rates as shown by Exhibit "B;" for such and further relief as may to justice and equity appertain; and for process.
A rule nisi was issued returnable on February 23, 1948. At the hearing the defendants filed a written motion to dismiss the petition. The court, on February 23, 1948, overruled the motion, *Page 835 
and the defendants filed exceptions pendente lite on March 26, 1948.
The petitioner introduced in evidence the petition as amended, together with certain exhibits attached thereto. The petitioner also introduced evidence by affidavits, exhibits, and documents. The defendant introduced evidence by affidavits and exhibits attached thereto. After introducing such evidence the defendants, on February 26, 1948, filed an answer, together with an amendment.
The petitioner, on March 5, 1948, filed written objections to certain portions of an affidavit of the defendants, entitled "General," and having to do with the commission's actions and reasons for promulgating its rate order of January 23, 1948. The court subsequently sustained certain portions of the objections.
The petitioner, on March 5, 1948, demurred specially to certain portions of the defendants' answer, and by amendment added additional grounds of special demurrer on March 8, 1948. On March 9, 1948, the court entered an order sustaining in part the demurrers and striking portions of the answer. The defendants excepted pendente lite.
The defendants introduced further evidence by affidavits, and then the petitioner introduced rebuttal evidence by affidavits.
On February 23, 1948, Georgia Hotel Association, naming as defendant Southern Bell Telephone Telegraph Company, filed a petition seeking to intervene in the proceeding "on behalf of its member hotels," and praying that the order of the commission of January 23, 1948, be not enjoined. The company demurred generally on the ground that no right to any relief by Georgia Hotel Association was shown by its petition, and also specially demurred on several grounds. The court subsequently sustained the demurrers and disallowed the intervention.
In an affidavit of the defendants, entitled "General," as hereinbefore referred to, it was stated: "As will appear from the [order of January 23, 1948], it was determined on this basis of computation that petitioner would require total earnings before the payment of State and Federal income taxes in the amount of $3,715,000 [annually], which would leave after the payment of income taxes $2,866,672 available for payment of interest and *Page 836 
dividends." The commission, however, as shown by the affidavit, disallowed certain items which the company had listed in its prior undertaking to obtain increased rates, and which resulted in the order of January 23, 1948, these items being as follows: payments to American Company under license contract, $360,765; rate-case expense, $63,984; losses sustained in operating lunch rooms for employees, $97,180; interest-arresting accruals on unfunded portion of pension reserve, $76,844; operators' wages, $556,000; operators' employment and training, $100,000; local commercial expenses, $150,000; advertising expenses, $50,000; accounting expense, $160,942 (of $1,322,942); rearrangements and changes expense, $607, 172; depreciation expense, $79,640; total, $2,302,527. Deducting this total from the annual amount of $3,715,000, required total earnings of the company as determined from the defendants' calculations, an amount of $1,412,473 was left, and the commission allowed rates which would provide additional annual revenue of $1,415,000 for the company as contemplated by its order of January 23, 1948. Since it is apparent, therefore, that the only issue is as to the propriety of including the above-named items in the bases for rate making, it is deemed necessary to set forth only such evidence as relates to such items.
As to license contract, Judson O'D. Shepherd testified for the petitioner: He has been continuously employed by Southern Bell Telephone Telegraph Company for over twenty years and is the Program Planning Engineer of the company. Southern Bell Company's capital stock is wholly owned by American Telephone Telegraph Company, which will be referred to as the American Company. The American Company has a General Department, through which Southern Bell receives certain services necessary for the economical conduct and advancement of its telephone business. In addition the American Company has a Long Lines Department, which provides the longer interstate toll service and facilities which interconnect the 22 Bell System operating companies into an integrated whole for the rendition of a nation-wide toll and related communication service and the extension of such service to foreign countries. The witness's reference to the American Company is to be understood as being restricted to the General Department. Southern Bell Company *Page 837 
has an agreement with the American Company covering Services, Licenses, and Privileges, dated June 24, 1930, which has been and is still in effect. A copy of the agreement was attached to the affidavit and made a part thereof as Exhibit "A." It is generally known as the License Contract and will be so referred to below. The deponent is familiar with this contract, the services called for therein, the circumstances under which such services are rendered, and the benefits which enure to Southern Bell thereunder. The services which are received may be generally outlined as follows: 1. Patent licenses. Southern Bell receives a royalty-free license under the 8000 to 10,000 patents owned or controlled by the American Company, or under patents owned by others to which the American Company has rights to license Southern Bell for the conduct of its telephone business. Southern Bell is held harmless in suits charging infringement of patent rights held by others on apparatus and the like recommended by the American Company. Southern Bell has purchased and uses extensively in Georgia telephones, telephonic devices, apparatus, methods, and systems covered by such patent rights. 2. Research and Development. Southern Bell receives in Georgia the benefit of the research, investigation, and experimentation conducted by the American Company and Bell Laboratories in the development of the technical side of the telephone business toward improving service, economy, efficiency, and safety in its operations. This work is performed principally by Bell Laboratories, which are the most comprehensive and extensive laboratories in the world in the communication field. It has over 6000 employees, substantially all of whom concentrate on the improvement in, and in reduction in cost of, telephone and related services. They include leading scientists in their respective fields of physics, chemistry, metallurgy, and mathematics. They further include inventors, engineers, and designers of telephone apparatus and systems. These specialists are provided with a vast array of experimental apparatus and facilities needed in the conduct of their profession and work. The telephone service of the Bell system is generally recognized as being the best in the world, and this is very largely attributable to the development work of the American Company and Bell Laboratories. The comprehensive *Page 838 
telephone service and facilities of Southern Bell in Georgia likewise have been in large measure the result of this work. Bell Laboratories does not stop in its services with the development of new and improved facilities for telephone central offices, for telephone station apparatus, for telephone cables, and substantially all other items of telephone plant. It is necessary for such facilities to be engineered, constructed, installed, and maintained by the Bell operating telephone companies. Bell Laboratories, as a necessary party of its services, provides what are termed Bell System Practices. These practices convey precisely the information necessary for engineers to engineer the equipment and plant, the plant forces to construct it, and the maintenance forces to maintain it. During 1946 Southern Bell received 676 Bell System Practices. In addition to that, it received 2117 new and reissued different telephone-circuit drawings with descriptions thereof, said descriptions covering 6455 pages. In addition, there were over 2900 different equipment drawings received. By different is meant different in subject, and excludes multiple copies of a single drawing. These drawings and descriptions, together with those received in prior years, are necessary for Southern Bell engineers and plant people in connection with the engineering, installing, and maintaining the telephone plant, including that in Georgia. 3. Advice and assistance. Southern Bell receives under the License Contract advice and assistance from the American Company in connection with all phases of its business and operations, including those in Georgia. These include: (Here follows a lengthy detailed account of services rendered to the following departments of the Bell Company: (a) General engineering; (b) Plant Department; (c) Traffic Department; (d) Commercial Department; (e) Accounting Department; (f) Financial Department; (g) General Information; (h) Other departments; (i) Conferences with American Company Representatives.) It was set out that some of the improvements recommended by the American Company resulted in reduced traffic expense in Georgia of $564,000 and reduced accounting expense of $26,000 for the year 1946. Other savings were illustrated by a chart attached to the affidavit, Exhibit "B." The left-hand column showed that the total of the illustrative *Page 839 
reductions in actual costs in Georgia for 1946 amounted to $2,266,000; the right-hand column showing the amount paid to American Company for services under the License Contract being $345,500. A middle column showed that the cost of rendering the services was $405,046. The savings were as to small-gauge cable, loading, repeaters, phantom circuits, and carrier circuits. It was testified that, had not the License Contract services been available to Southern Bell, it would have been necessary for the company to have obtained them elsewhere or to have attempted to render them itself, but that there is no organization other than the American Company and Bell Laboratories which renders the comprehensive services extending to every detail of the business. Southern Bell has not the physicists, chemists, metallurgists, development engineers, and similar specialists in its employment for performing such services; and if it should attempt to do so, it would have to maintain a general staff many times its present size, suitably housed and provided with costly research apparatus and equipment. It is the affiant's opinion that such services would cost Southern Bell much more if it attempted to render them for itself, and the annual savings are many times the amount which is annually paid for them.
Harry C. Gretz testified by affidavit for the petitioner in substance as follows: He is a graduate of the Evening School of Accounts and Finance of the University of Pennsylvania and is Assistant Comptroller of American Telephone Telegraph Company, referred to as the American Company. He testified in detail as to the relationship between the American Company and Bell Companies in which it held the majority stock, and as to the services rendered under the License Contract, attaching to his affidavit exhibits showing expenses and revenues from such relationship. He explained that the basis of the cost to the Southern Bell for such service was 1 1/2 percent of its gross revenue as provided by the contract, such rate having been in effect since 1929; that in the year 1946 the cost of furnishing such service to Southern Bell was $405,046, exclusive of capital costs; and that the American Company was paid for such service $345,500, a deficiency of about $60,000.
The defendant commissioners testified by affidavit substantially *Page 840 
as follows: In the effort made by the Bell Company to obtain increased rates preceding the issuance of the order of the commission on January 23, 1948, the petitioner sought to justify payments made to the American Company by statements of costs incurred by the parent company in the operation of various departments, which costs were arbitrarily allocated to associated and affiliated companies, including the petitioner, without regard to specific services, benefits, and privileges resulting therefrom. The petitioner sought, through the use of allocation formulae, to show that the amount paid the holding company was actually less than the alleged costs arbitrarily allocated; in fact, one of the petitioner's computations alleged the cost of rendering license service in Georgia was $390,415 for the year 1945, while another computation shown in an exhibit alleged the cost for the same year to be $330,428, illustrating the indeterminate amount assignable even under the petitioner's own arbitrary allocation. In the first instance, a charge was made for interest on money alleged to be held for future use in the amount of $102,000, whereas the second computation omitted this fictitious charge and substituted the equally unjustified charge for holding company Federal income tax and other corporate expense in an effort to make up the total of the cost assigned to Georgia as contained in the first computation, a copy of the two computations being attached to the affidavit as Exhibits "B" and "C". Such allocated costs can not be considered proper costs of providing telephone service in the State of Georgia. During the course of the hearing one of the petitioner's witnesses admitted that increased revenue from an increased number of subscribers and increased revenue from a rate increase, if authorized, would automatically increase the fees it paid to its affiliate under the License Contract, and that no additional services or benefits would accrue to Southern Bell's Georgia operations by reason of the increased charges assessed by the holding company. Since 1936, when the commission issued its above-referred-to order, according to reports filed with the commission by the petitioner, the petitioner has increased its payments to the parent company from $122,000 in 1936 to $360,765 in 1947, and this payment would automatically be further increased by $60,900 if the petitioner's rate schedule as *Page 841 
requested had been approved, since no ceiling has been placed on the amount to be paid for these alleged services. The monetary value of certain improvements to the telephone plant, the cost of which improvements has been recovered in the past, is no justification for payments under the License Contract to the American Company, especially in view of the fact that every single major item of improvement which has been cited, such as loading, repeaters, carrier equipment, phantom circuits, coaxial cable, and small-gauge cable, have been in general use throughout the industry for many years. In view of these and other complexities, the commission could not do otherwise, in fairness to telephone users and rate payers in Georgia, than to impose the simple requirement, which has been met by other utilities, that justification for payments be made by setting forth in detail each act of service charged for, the out-of-pocket expense incurred for the benefit of the owned company, and that the expense so incurred was reasonably necessary and the act of service reasonably beneficial to the company in its rendition of service to the public. The Bell Company is managed by its own very capable local officials, beginning with its able president and an official at the head of each department of its business and completely staffed in each department and division of its business with capable department heads and engineers, accountants, and other technicians, all of whom are adequately trained and equipped to properly manage its business. The Bell Company charges to Georgia operating expense a payment of 1.5 percent of gross revenues under the License Contract on substantially all of its operating revenues, but it has never at any time reported to the commission the exact service rendered for this charge.
Judson O'D Shepherd, testified by affidavit for the petitioner: The defendant commissioners testified by their affidavit: "That the monetary value of certain improvements to the telephone plant, the cost of which improvements has been recovered in the past, is no justification for payments under the License Contract to the American Company, especially in view of the fact that every single major item of improvement which has been cited, such as loading, repeaters, carrier equipment, phantom circuits, coaxial cable, and small-gauge cable, have been in general *Page 842 
use throughout the industry for many years." The affiant says that these developments were made, and the improvements in them are continuously being made, for all of the Bell companies by or through the American Company as a License Contract service. Improved loading, repeaters, and carrier systems have been used generally in the plants of the independent telephone companies for only the last few years. Prior to that time, and for the good of the overall telephone service, some such facilities were leased by Southern Bell to its connecting companies. However, the Bell System is the organization for which the developments were made as a License Contract service. The statement in the commissioners' affidavit that coaxial cable had been in general use throughout the country for many years is not in conformity with the facts. The facts are that this is one of the most recent developments in the telephone art. Its use for telephone service is wholly restricted to the Bell System. Extensive use has been made of this new development only since World War II. The coaxial cable between Atlanta, Georgia, Macon, Georgia, and Jacksonville, Florida, was one of the earliest installed for commercial service, yet coaxial circuits in this cable were first placed in service late in 1945. The affiant's Exhibit "B" shows that the actual costs in Georgia were less by $2,266,000 in 1946 than if the improvements had not been made, and that the license payments in that year were $345,500 for the State, or less than one-sixth of the savings. Affiant knows from experience in research and in his current work that it is impossible to undertake a comprehensive development at the beginning of a year, complete it, carry it through the design and engineering phases, effect its manufacture, install it, and in that same year reap the full benefits of its development. This over-all procedure with realization of the benefits therefrom extends over many years. The development work of the American Company and Bell Laboratories is, and will continue to be, beneficial to Southern Bell and its customers.
Harry C. Gretz further testified by affidavit for the petitioner, giving his reason why the following statements in the affidavit of the commissioners were not supported by facts: (a) "The alleged costs allocated to petitioner representing holding-company *Page 843 
income taxes and other items of corporate expense of the holding company cannot be considered proper costs of providing telephone services in the State of Georgia." (b) "Petitioner sought further through the use of allocation formulae to show that the amount paid to the holding company was actually less than the alleged costs arbitrarily allocated; in fact, one of the petitioner's computations alleged the cost of rendering license service in Georgia to be $390,415 for the year 1945, while another computation shown on an exhibit submitted during the course of the hearings alleged the cost for the same year to be only $330,428, illustrating the indeterminate amount assignable even under petitioner's own arbitrary allocation. In the first instance, a charge was made for interest on money allegedly held for future use in the amount of $102,000, whereas the second computation omitted this fictitious charge and substituted the equally unjustified charge for holding-company Federal income tax and other corporate expense, in an effort to make up the total of the cost assigned to Georgia as contained in the first computation, copy of said two computations being hereto attached and marked Exhibits b and c." (c) "On the other hand, petitioner sought to justify payments it made to its holding company by statements of costs incurred by the American Telephone and Telegraph Company in the operation of various departments which costs were arbitrarily allocated to associated and affiliated companies, including petitioner, without regard to specific services, benefits, and privileges resulting therefrom." (d) "During the course of the hearings one of petitioner's own witnesses admitted that increased revenue from an increased number of subscribers and that increased revenue from a rate increase, if authorized, would automatically increase the fees paid to its affiliate under the License Contract, and further admitted that no additional services or benefits would accrue to Southern Bell Telephone and Telegraph Company, Georgia operations, by reason of the increased charges assessed by the holding company." (e) "The petitioner has increased its payments to the parent holding company from $122,000 in 1936 to $360,765 in 1947 and this payment would automatically be further increased by $60,900 if the petitioner's rate schedules as requested had been approved, since no ceiling has been placed on the *Page 844 
amount to be paid for these alleged services." It was stated in the affidavit of the deponent that the services performed by the American Company are determined by the License Contract, that it is adequately performing all of the necessary services called for, and therefore no additional services are contemplated coincident with any authorization of increased rates, and that the test of the reasonableness of the payment under any level of increased rates can be had by estimating the payments under such increased rates and comparing them with the costs of rendering the service.
Judson O'D. Shepherd testified further by affidavit for the petitioner: He is familiar with the work conducted by Bell Laboratories and the basis of billing the American Company and Western Electric Company for work which is performed for each of them, this familiarity having been gained through his association with Bell Laboratories and its people in New York in connection with advice and assistance received from them by Southern Bell under the License Contract. An affidavit of the commissioners contained the following statement: "That the scientific research carried on by the Bell Laboratories (the cost of which is claimed as part justification for payments made under the license contract) is not restricted to the development of equipment and facilities for use in connection with regular wire telephone communication, but covers a wide field of research such as radio, radar, microwave, and television." As to this the deponent says that the major activities of Bell Laboratories are directed toward providing improved and more economical communication services and facilities for the Bell telephone operating companies. These are primarily directed to equipment and facilities for use in connection with regular wire telephone communication and related services. As a part of their work, these Laboratories conduct research for improved and more economical communication facilities which are not restricted to telephone services. The statement by the commissioners that the cost of research in connection with radar is claimed as part justification of payments under the License Contract services is contrary to facts. Such work is conducted for United States Government agencies, and the cost of such work is billed these agencies *Page 845 
through Western Electric Company. None of such costs are billed the American Company, and consequently none are claimed in justification for payments under the License Contract. The commissioners mention "microwave," which is a term generally applied to radio systems having a very short wave length. This development is also directly related to telephone service, and is applicable to such service in Georgia. The affiant is informed of this development, and when additional facilities or new circuits are required to the islands along the Georgia coast, including Jekyll Island, a study will be made of the economic application of this instrumentality as an alternative to costly construction across the coastal swamps. The extensive services rendered by Bell Laboratories in providing improved and more economical telephone service in the day-to-day operations of Southern Bell's business in Georgia, which have resulted in reducing yearly costs amounting to many times the annual payment for all of the License Contract services for the State, appear in deponent's original affidavit in this case. These services were ignored in the commissioner's supplemental affidavit. Those few research projects mentioned comprise a very small segment of the activities of the 6000 employees of Bell Laboratories. The commissioners also ignored in their supplemental affidavit all of the day-to-day services rendered Southern Bell directly by the American Company, which were of great value to Southern Bell in Georgia, and which were set out in the deponent's original affidavit.
As to rate-case expense, the commissioners testified by affidavit: Since this expense has already been incurred and is not recurring in nature, there appeared to be no reason for providing this sum as a future operating expense.
As to rest and lunch-room expense, the commissioners testified by affidavit as follows: They are not of the opinion that the company should not provide lunch-room service to its employees, but that it should at least collect the cost of the services provided from those officials and employees who benefit thereby. Good business does not dictate that the telephone subscribers should be called upon to subsidize meals and refreshments sold in the company cafeteria at a loss. The deponent say further that the loss incurred does not include any fixed charges or overall *Page 846 
rental for the space in the building used for rest and lunch-room services. The building is contained in the investment of the petitioner upon which it seeks a fair rate of return. True equity would require the assessment of a reasonable rental over and above the so-called house service expense or the allocation of a portion of the petitioner's investment, together with fixed charges thereon, for the space used in providing the employees with cafeteria service, and the charges made for lunches and refreshments should be sufficient to cover not only the out-of-pocket costs but also the reasonable rental or properly allocated fixed capital charges.
As to this expense, J. D. Porter testified by affidavit for the petitioner: The operating-room job is unique, in that the service demands require coverage for 24 hours each day and for every day in the year, holidays and Sundays, of course, being included. This imposes upon the management a very serious problem in the employing and retaining of the required number of operating-room people with the proper qualifications to furnish at all times a satisfactory grade of service. This problem is further accentuated by the fact that only women employees are used and a large percentage of those are young women. To overcome these difficulties, it has been necessary that, not only our wage rates, but our working practices and working conditions be designed to attract and hold in our employ both the quantity and quality of women employees that are required. The company has for a long period of time provided cafeteria or lunch-room service in the five largest cities in Georgia. Probably a larger portion of telephone-operation employees than in any other business find it necessary to eat one or more meals each working day away from home due to the irregular hours associated with the distribution of calls, the slack hours coming at times of the day when the usual commercial eating places are not always serving meals, for example, lunch as early as 10 a. m. or as late as 4 p. m., and supper as late as 8 p. m. The expense incurred in connection with lunch-room operation in the State of Georgia for the last half of 1947 was at the annual rate of $85,743. No attempt has been made to profit from this service, although the company does attempt to maintain a reasonable balance between receipts and *Page 847 
expenses. Experience has indicated that the providing of wholesome food and a balanced diet to the young women who make up our operating-room personnel has definitely improved their health, attendance, and efficiency. It has also proved to be a substantial aid in the employment of suitable people to render an efficient service. Providing this service has in many cases enabled the company to locate its buildings away from business districts where real-estate values are cheaper. The earliest tours of duty in the operating room being at 6 a. m., and evening hours extend until 12 midnight. The all-night employees report at 10 p. m., and go off duty at 7 a. m. For the reason that the tours of duty with their relief and lunch periods range throughout practically all hours of the twenty-four, it is necessary that food be ready for service during long periods of the day. For these reasons, the cost of operation is higher than if meals were served for a limited number of hours as is the practice with commercial eating establishments. Considerably less than 1 percent of the meals served in the lunch rooms in Georgia are to officials of the company. In two of the company's Georgia lunch rooms, due to a shortage of space, the serving of meals is restricted to women operating-room employees. The benefits described above are of real value, both to the company and to the telephone users and, in the deponent's opinion, are equal to the cost incurred.
Otto C. Richter testified by affidavit as to pension expense: He is Chief Statistician of American Telephone Telegraph Company, a graduate of the University of Michigan where he specialized in actuarial mathematics. In the administration of the Bell System pension plans he is responsible for the determination of accrual rates used by the companies in making provision for the ultimate cost of pensions under the uniform pension plans. Practical experience has made it clear that the only effective solution to the problems arising out of employees' superannuation lies in the establishment of a pension plan. Like the majority of pension plans in industry, the Bell System plan is non-contributory, the entire costs being met by the company. Male employees are entitled to retire at their own request, or they may be retired in the discretion of the company, upon attaining the age of 60, provided they have had 20 or more years of service. *Page 848 
They may be retired at the discretion of the company, but not solely at their own request, if they have attained the age of 55 and have had at least 25 years of service, or at any age if they have had at least 30 years of service. The eligibility requirements for females are the same as those for males, except that in each case the age requirement is 5 years lower. For both male and female employees retirement is automatic upon the attainment of age 65. By the terms of its plan Southern Bell has established a pension fund held in trust solely for pension purposes, and has undertaken to make periodic payments to the Trustee in such amounts that, when employees are retired or become eligible to retire at their own request under the plan, there will be available in the pension fund an amount sufficient to provide for them pensions in the amounts stated in the plan. The Trustee pays the pensions out of the fund. The balance in the fund is invested and the earnings augment the fund. All moneys in the pension fund are dedicated irrevocably to service pension purposes, and the company has undertaken to take such action as may be necessary or appropriate to insure the application of the entire fund to such purposes. During the first 14 years of the plan, namely from 1913 to 1926, inclusive, pensions were handled on a pay-as-you-go basis, that is, they were charged to expense as paid. Actuarial studies indicated that the continuation of the pay-as-you-go-plan basis throughout the life of the plan would have resulted in relatively heavy expense in the later years. Under such a program the amounts actually paid out currently to retired employees start at a deceptively low figure, but they increase steadily for many years thereafter and ultimately reach a substantial percentage of payroll. Experience has shown that, if this increase in disbursement requirements is not anticipated and provided for by a sound financial program, the result is likely to be a termination, or at least a drastic curtailment, of the pension plan.
Accordingly, in 1927 Bell System Companies requested the Interstate Commerce Commission, which then regulated telephone company accounting, to amend the prescribed system of accounts so as to permit advance accruals on an actuarial basis for pensions. This was done, and account No. 672 was amended by a *Page 849 
provision authorizing under specified conditions advance provision for pensions by monthly charges to expense. Shortly thereafter Southern Bell Company, as well as other Bell System companies, revised its pension plan to conform to the requirement specified for accrual accounting, which included the establishment of an irrevocable pension-trust fund, and adopted the actuarial accrual method of providing for pension costs. The accrual plan initially adopted was the so-called "15-year" basis, under which accruals were made from and after the completion of the 15th year of employee service. After several steps in the accrual program, the company, in 1941, took what may be reasonably regarded as the final step in the development of its accrual program, that is, a program under which, assuming that the company at least maintained its size at that time, pension expense could be expected to continue substantially level as a percentage of payroll, provided the pension plan continued without change and future experience in regard to the various factors affecting pension costs conformed to the experience assumed in the actuarial calculations. The accrual rates used by the company in the past and the rates currently being used were recommended to it by the American Company, which maintains a group of actuaries for that purpose. Payments based upon the accrual rate are made to a trust fund and thereby irrevocably devoted to pension purposes. Under no circumstances can these amounts revert to the company and be used for any other purposes. In accordance with the accounting requirements of the Federal Communications Commission, a portion of the current pension accruals of the company is charged to operating expenses under account No. 672, Relief and Pensions, and the balance is charged to income under account No. 323, Miscellaneous Deductions from Income. The final step in the accrual program, taken in 1941, was to include in current accruals an amount equal to interest on the unfunded at the rate assumed in the actuarial calculations. This portion of the accrual, which represents in effect a substitute for interest not earned on amounts not funded, serves to arrest the growth of the unfunded and is the amount now chargeable to account No. 323. The unfunded actuarial reserve requirement is not a deficit or deficiency in the sense that those terms imply *Page 850 
that the company should have made provision in the past for this item of pension cost. The company adopted a reasonable step-rate program, such as has been adopted by the Government in the Social Security and Railroad Retirement Plans, for meeting the cost of pensions, and it has at all times made the required payments under that program. Actuarially the amount of the unfunded as determined and fixed in 1941 was merely a portion of pension costs, namely, that portion not provided for by the funds in hand and prospective full-service accruals. These payments are made to preserve the integrity of the fund and they are required to protect the pension interests of employees. It is mathematically certain that these amounts must be paid into the fund if future pensions promised under the plan are to be paid in full from the fund. Under U.S. Treasury Department Regulations 111, both the accruals charged to account No. 672 and the accruals charged to account No. 323 are treated as expense for tax purposes.
As to this expense, the commissioners testified by affidavit as follows: About the year 1928 Bell Company changed its pension plan, therefore a "Limited Pension Plan" as now referred to by the company, to a partial accrual basis, and a pension reserve fund was established, into which was paid over certain accruals which had been accumulated by the company out of earnings amounting to $1,568,704, and later or in 1940 the company decided to take what it calls the "final step" to go to a full accrual pension plan. This resulted in increasing this particular item of operating expense by a greater percentage than any other major item of operating expense, it having increased from $142,508 for the year 1939 to a sum more than eight times that amount in 1947 or $1,150,603. The total funded accrual for the entire Southern Bell operation, approximately one-sixth of which is allocable to Georgia, has been accumulated and paid into Bankers Trust Company of New York as trustee, on which the trustee realized earnings from investments in 1946 in the amount of $730,562, plus a net profit of $14,578 on securities disposed of during the year or a total of $745,140, while the total disbursements from the fund during the year 1946 amounted to only $715,448. The interest charge on the amount assessed by the *Page 851 
company against the rate payers of Georgia as an additional charge over and above the current pension accrual amounted for the year 1947 on an annual basis to $76,844. Of the total of $1,150,603 charged to Georgia operating expense in 1947 for Relief and Pensions, the sum of $945,552 was earmarked for pensions, which balance included the interest charge above discussed, which was disallowed by the commission. The deponents reaffirm that they favor an adequate pension plan for the officials and employees of Southern Bell, but express the strong feeling that the plan should be made cooperative with the employees participating in its management and support. The payments to pensioned Georgia employees in 1947 amounted to approximately $130,000, whereas under the commission's order notwithstanding the fact that it criticized the present pension plan, the amount recognized as a proper operating expense exceeded the actual pension payments by approximately $738,708.
The commissioners testified by affidavit as to operators' wages as follows: It is recognized that conditions in 1939 were not comparable to the abnormal conditions existing in 1947 with respect to required supervision, operator efficiency, and overtime conditions, as demonstrated by the fact that it was not assumed that a reduction in the amount of the total difference of operating wages in the amount of $1,056,000 could be immediately achieved, but the reasonable conclusion was reached that a saving and reduction in this expense to the extent of one-half of that difference or $556,000 can and will be realized under the rapidly improving conditions now existing. Operators' wages comprise approximately 85 percent of the traffic department expense of the company, and the total for operators' wages of $7,820,352 for 1947 was computed on the basis of actual figures for the third quarter of 1947 projected to a full twelve-months period. Since the close of the hearing the company has filed with the commission its operating results for the fourth quarter or last quarter of 1947. The figures covering the expenses of the traffic department for the fourth quarter show a decrease of $139,326 over the expenses for the third quarter, or a decrease on an annual basis of $557,304 or 6.1 percent. Reports of the company further show that the average number of stations in service for the fourth *Page 852 
quarter shows an increase of 15,669 over the third quarter, an increase of 4.2 percent, indicating that the traffic department during the last quarter of 1947 rendered its telephone service on a more economical basis as compared with the third quarter of 1947. This information as to the fourth quarter did not actually reach the commission until after the issuance of its order, in which the assumption was made that the total annual savings in the amount of $656,000 in traffic department expense, made up of $556,000 in operators' wages and $100,000 in operators' training, would be realized, and these figures furnished by the petitioner fully justify and support the judgment and findings of the commission. The cost of operators' wages charged to Georgia operating expenses by Southern Bell for the year 1939 was $1,700,938, and the said cost for the third quarter of 1947 projected to an annual basis was $7,820,352. This latter figure was derived by multiplying cost of operators' wages charged to Georgia operating expenses by the company in the months of July, August, and September, 1947, by four, in order to project this cost to an annual basis. This 1947 projected cost represents an increase of 360 percent over the cost for the year 1939. For the third quarter of 1947, projected to an annual basis, the total traffic expense for Georgia operations of Southern Bell was $9,140,601, of which operators' wages, on the same basis, was $7,820,352 or 85.56 percent of the total traffic expense stated. The traffic expense for the fourth quarter, projected to an annual basis in the same manner as described above and for Georgia operations, was $8,583,296, or $557,305 less on an annual basis than the same expense for Georgia operations for the third quarter of 1947.
As to operators' employment and training expense, the commissioners testified as follows by affidavit: With the rapid increase in the installation of dial telephone equipment, either in lieu of or in addition to the present manually operated telephone equipment requiring operating personnel, the number of operators required by the petitioner will not increase materially, but will actually remain relatively constant or be reduced. The rapid and vast expansion of the petitioner's facilities and service during the war period and immediately thereafter admittedly required the petitioner to recruit a large number of new operators, which *Page 853 
necessitated unusual and abnormal cost for their employment and training. That employment expense will continue to decline, since the only training required will be to replace personnel leaving the service of the petitioner with very little, if any, training required to augment the presently expanded operating personnel. The large increase in operators' wages from $1,700,938 in 1939 to $7,820,352 in 1947, on an annual basis, clearly shows the extent to which the operating personnel has expanded in recent years, which indicates the reason for the abnormal amount of operating expense incurred in their employment and training. Operators' employment and training in 1947 in the amount of $501,937 was 21.15 times the amount of such expense in 1939, although operators' wages in 1947 in the amount of $7,820,352 was only 4.6 times the amount in 1939. Expressed another way, employment and training expense was approximately 1.4 percent in 1939 of the total wages paid to operators in that year, while that expense in 1947 was 6.4 percent of the operators' wages in 1947. It is, therefore, apparent and logical to conclude that this item of expense will continue to decline and will not exceed $400,000 in 1948 or $100,000 less than $501,937, which represented this item of expense for 1947. Based on the facts above stated, it is quite possible that the commission has allowed more than will be required for this item of expense in determining just and reasonable rates for Southern Bell. The petitioner's cost of operators' employment and training includes salaries paid to student operators receiving training, the wages of operators when receiving supplementary training, and the salaries paid to the instructors, according to the Uniform System of Accounts for Telephone Companies prescribed by the Federal Communications Commission in accordance with the provisions of the Communications Act of 1934. The account, "Operators' Employment and Training," includes also costs of employment of new operators and other expense items relating to employment and training. The petitioner's cost of employment and training in Georgia was $23,733 in 1939 and $710,995 in 1946. For the third quarter of 1947, projected to an annual basis, this cost was approximately $501,937. This latter figure was arrived at by multiplying the cost of operators' employment and training in the months of *Page 854 
July, August, and September, 1947, by four, in order to project this cost to an annual basis.
As to this expense, J. D. Porter testified for the petitioner by affidavit as follows: In the affidavit of the commissioners regarding operators' employment and training expense, the conclusion is drawn that, since this expense was less in 1947 than in 1946, the downward trend will continue into the future. In order to furnish satisfactory service, it is necessary that inexperienced employees be given a training course in operating work before being assigned to a regular work tour. Subsequent training is required when an employee is assigned to a different type of operating or is promoted to a job of higher skill. The employment and training expense for Georgia for the last six months of 1947, converted to an annual basis, was $431,005. Approximately 98 percent of this amount was the salaries and wages of the student operators and their instructors. All operating-room employees are women, most of them being employed immediately after finishing high school, and a relatively high loss rate is normally expected. This factor, coupled with a large number of employees required in the State to give service and the rapid growth of the business, requires now and will require in the future the addition of a substantial number of new employees. Following the close of the war, there was some improvement in the force loss rate of traffic operating-room employees in Georgia, which resulted in some reduction in training expense for 1947 as compared to 1946, but the loss rate for the last half of 1947 for these employees was higher than during the first half of the year, and as long as reasonably full employment is maintained the deponent can see no reason to expect a reduction in the present loss rate. The proposed conversions of manual service to dial service in the State of Georgia are relatively small, and the history of past operations is contrary to the theory expressed by the commission. The substitution of dial service for manual service does not eliminate the need for telephone operators. With dial service operators are required for handling long-distance calls, information calls, intercepted calls, and calls where dial subscribers request the assistance of an operator in completing a connection or verifying a number. From the statistics shown on *Page 855 
Exhibit 1 attached to the affidavit, it can be seen that, despite an increase in dial telephones in Georgia from 36.31 percent of the State total at the end of 1935 to 66.51 percent at the end of 1947, the traffic employees required increased by 198.7 percent during the period. During these twelve years in only one year was there a reduction in employees as related to the previous year, and for each year the total traffic expense for Georgia was higher than the expense for the previous year. Despite the large increase in dial telephones, there were more manually operated stations and more originating calls from manual stations during the last half of 1947, converted to an annual basis, than during 1935. The work involved in the handling of only long-distance calls during the last half of 1947, converted to an annual basis, was in excess of the work involved in the handling of all calls in 1936. The total traffic expense for Georgia increased from 1935 to the last half of 1947, converted to an annual basis, by 585 percent. These comparisons indicate the fallacy of estimating for the future a reduction in the number of traffic employees and in the amount of traffic expenses because of possible conversion from manual to dial service. To maintain the Georgia operating forces at the level that existed as of the end of 1947, without giving consideration to additional employees required because of the growth of business, would require in 1948 the addition of 1817 new employees, if the loss rate that existed during the last half of 1947 is maintained. This is 119 more additions than for the last half of 1947, converted to an annual basis.
As to commercial expense, C. J. Yates testified for the petitioner by affidavit as follows: He has been continuously in the employ of Southern Bell since August 8, 1920, and is now Georgia manager. He is directly responsible for the operation and expenses of the Commercial Department in the State of Georgia. The Commercial Department is responsible for the proper conduct of all business transactions with the company's customers. It is responsible for the proper conduct of the company's business with the general public and public authorities. It has the responsibility of representing the company in the communities it serves and of effectively carrying out the company's policies and practices. Business transactions with the public include the *Page 856 
handling of contacts initiated by the public in regard to such matters as applications for telephone service, inquiries regarding pending applications for service, the moving or rearranging of existing service, discontinuance of service, complaints, charges for service, payment of bills, contract negotiations, collection and related matters, directory and related matters, requests for radio and special facilities, requests for assistance on communication problems, and any other matters which customers or individuals take up with the company. The trend in the total Commercial expenses in the State of Georgia during the past four years has been as follows: year ending December 31, 1944, $1,489,941; year ending December 31, 1945, $1,731,216; year ending December 31, 1946, $2,244,021; year ending March 31, 1947, $2,334,526; six-months period ending December 31, 1947, equated to annual basis, $2,812,380. The major increase in Commercial expense during the past four years has been brought about by wage adjustments, scheduled increases granted employees and increases in the employees necessary to handle the growing volume of contacts originated by the public. The increase in total Commercial expense for the year ending March 31, 1947, over the year 1944 was 56.7 percent. For the same period the number of employees increased 54.2 percent, and the contacts originated by the public increased 73.8 percent. A similar comparison of the last six months of 1947, equated to an annual basis, when compared with the year 1944 shows that total Commercial expense increased 88.8 percent, the number of employees increased 77.8 percent, and the contacts originated by the public increased 122.9 percent. Since the volume of contacts originated by the public has increased at a faster rate than the total Commercial expense for the period shown and has likewise increased at a faster rate than the total Commercial employees in the State of Georgia, it is evident that Commercial operations in Georgia have been carried on effectively and efficiently. With the exception of advertising, public telephone commissions, and directory expenses, 84 percent of the remaining Commercial expenses for the six-months period ending December 31, 1947, equated to an annual basis, is represented by salaries and wages. The largest single item of Commercial expense is the cost of operating our local business *Page 857 
offices located in communities which we serve. For the six-months period ending December 31, 1947, equated to an annual basis, this expense was 47.3 percent of the total Commercial expense in Georgia, and 85.3 percent of this expense is represented by salaries and wages. The increases in this item of expense are, therefore, represented by salaries and wages for employees and are in direct relation to the increase in the contact load originated by the public. While it may be expected that many of the service applications now on hand will be filled at some time in the future, the heavy current demand for service maintains the volume of these held orders at a high level, and this condition is expected to continue for some time into the future. Another item of Commercial expense which is included in the above total is advertising, which is made up of newspaper advertising, posters, pamphlets, and inserts included in customers' bills. It has been the policy of the company for many years in the State of Georgia to inform the public, through posters, pamphlets, bill inserts, and newspaper advertising, regarding matters pertaining to the company's service, policies, plans, and other matters which are of public concern and interest. In considering the expansion plan now under way to meet the heavy demand for additional telephone service, there is no reason to believe that any reduction can be made in the advertising expense in the foreseeable future. In addition to the increasing need for various advertising media, the rates for newspaper advertising have increased materially, as has the cost of producing bill inserts, posters, and pamphlets. Based upon the knowledge and experience of the deponent in the handling of commercial matters for the company over many years, he knows that the Commercial operations of the company in this State are being carried on economically and efficiently. He is also confident that the Commercial expense in the State of Georgia over the next several years can not be reduced without adversely affecting telephone service to the public in the communities in which the company operates; on the contrary, these expenses may be expected to increase with the growth and development of the telephone business in this State.
The commissioners testified by affidavit as follows: Local Commercial operations expense for Georgia was $317,807 in 1939; *Page 858 
and was $1,309,848 for the third quarter of 1947, projected to an annual basis. This latter figure was derived by multiplying the cost of Local Commercial Operations expense in the months of July, August, and September, 1947, by four, in order to project this cost to an annual basis. This 1947 projected cost represents an increase of 312 percent over the cost for the year 1939. The average number of company telephones in service in Georgia has increased 102.41 percent for the same period. The unfilled applications with the Commercial Department for service in Georgia as of June 25, 1947, were 59,539, and on December 31, 1947, were 50,881, showing a decrease of 8658.
C. J. Yates testified by affidavit for the petitioner: With respect to the reference in the affidavit of the commissioners as to number of unfilled applications for service in Georgia as of June 25, 1947, the deponent says that at the end of 1946 the petitioner had on hand 51,660 applications for service; that as of June 25, 1947, following the strike period during which installations were practically at a standstill, there were 59,539 such applications on hand, and at the end of 1947 there were 50,881 such applications pending in Georgia. It is the present view of the deponent that at the end of 1948 the company will have 40,560 such applications for service, in spite of the fact that it is estimated that 102,300 telephones will be installed during this year. This view is based on the premise that the expansion program now under way will be continued at the present or a higher level.
As to advertising expense, the commissioners testified by affidavit as follows: The amount of the petitioner's expenses for advertising charged to Georgia operations in the following years was: 1939, $33,785; 1940, $43,230; 1941, $49,985; 1942, $88,987; 1943, $103,163; 1944, $48,897; 1945, $65,491; 1946, $123,203. The amount of the petitioner's advertising expenses charged to Georgia operations in 1947 was $91,291, based on the expense for the period July 1, 1947, to September 30, 1947, projected to an annual basis, the said projection being accomplished by multiplying the expense for the period July 1, 1947, to September 30, 1947, by four. To the affidavit were attached and made a part thereof copies of four advertisements paid for by the petitioner, the expense of which was charged, all or in part, to the Georgia operations. *Page 859 
The deponent says that the petitioner is unable to supply all current demands for its service.
C. J. Yates testified by affidavit for the petitioner: As to the affidavit of the commissioners with attached four copies of advertisements of the petitioner, the deponent says that it has been the policy of the company for many years to inform the public through posters, pamphlets, bill inserts, and newspaper advertising regarding matters pertaining to the company's services, policies, plans, and other matters which are of concern and interest to the subscribes and the public generally. It has been the practice of the company to adjust the volume and nature of its advertising in line with what it believes appropriate to keep the public informed. The amount of money paid out for newspaper advertising during the third quarter of 1947 (except $247.46 to cover payment of delayed bills for advertising run during the strike) covered 42 different advertisements, which were run in the daily and weekly publications in Georgia, as set out in detail in the affidavit.
As to accounting costs, H. R. Stone testified: He is Comptroller of the company. The accounting work for Georgia is done in the Division accounting office in Atlanta. This work is divided into: 1. keeping customers' accounts and rendering bills, which in turn involves individual pricing and itemization of each long-distance call and detailed computation of excise taxes on both local and long-distance service charges and accounting therefor to the Government; 2. preparation of payrolls and pay checks, including audit and summarization of daily and weekly time records, computation of withholding taxes, preparation of necessary records required by Federal and State social-security and income-tax laws; 3. audit, payment and accounting for all sundry bills and vouchers; 4. maintenance of detailed records of materials and supplies by locations; 5. accounting for the addition and retirement of all property units; 6. maintenance of basic records of investment, revenues, and expenses, and preparation of reports therefrom; 7. maintenance of property unit records in both map and ledger form. The accounting costs rose from $300,423 in 1940 to $1,322,942 in the last six months of 1947, equated to an annual basis. This increased cost has been caused principally *Page 860 
by the following factors: 1. increase in volume of accounting work due to the company's plant and facilities and telephone usage; 2. increased basic wage levels of employees; 3. additional or new accounting work not required in 1940; 4. increase in postage rates and costs of stationery, supplies, and house-service expense due to increased volume and prices. To illustrate the tremendous increase in volume of business in the last half of 1947, equated to an annual basis, compared with the year 1940: Number of toll tickets increased 208 percent. Number of customers' bills increased 99 percent. Number of work reports and service orders increased 116 percent. Amount of gross construction accounted for, 276 percent. Wage rates have increased 77 percent. Some of the work now required but not required in 1940 consists of: 1. Records, computations and reports incident to, (a) excise tax on local telephone service; (b) withholding from employees' pay under Federal Revenue Act of 1943; (c) preparation and issuance of United States War Savings Bonds; (d) payroll deductions for employees' hospitalization insurance. 2. Maintenance of property records not formerly required. 3. Auditing work to insure compliance with Union Working Agreement. Postage has increased to $114,740 in 1947, an increase of $72,443 over 1940, and other various expenses have increased. The deponent's close and continuing supervision over the Georgia accounting work during the past nine years enables him to state positively that the work is being efficiently and economically performed, and he can foresee no reduction in the accounting volume, but there is every reason to expect increase in total work volume with attendant increase in total accounting cost.
As to rearrangements and changes expense, W. K. Boardman Jr. testified by affidavit for the petitioner: One of the subdivisions of total maintenance expense is called rearrangements and changes. This expense is the cost of the work required to rearrange or change, or to interconnect or disconnect, existing plant with additional plant provided by construction. Such arrangements include the tying in of existing plant with newly constructed plant, the changing of existing plant to provide facilities in these locations where growth required these facilities, the moving of telephone instruments and apparatus from one location to *Page 861 
another on the subscriber's premises, and the changing out of station apparatus of one type with another type where service is changed as from common battery to dial. In general, this expense is associated with and made necessary by additions to plant, and is substantially influenced by the volume of construction and installation activities. To illustrate: A line of poles down a highway supports one cross arm which carries ten wires. It is decided that these poles should be replaced by taller poles in order that additional cross-arms and wires may be placed on them. The existing poles are removed from plant, and the cost of removing them and their original cost in plant, less salvage, is charged against the depreciation reserve. The cost of the new taller poles is charged into the capital accounts. The cost of transferring the existing cross-arms and the ten wires which they support from the old poles to the new replacing poles is charged under the Uniform System of Accounts to rearrangements and changes. Attached to the affidavit was an exhibit showing for the years 1940 through 1947 total maintenance expense and that part classified as rearrangements and changes and also the average expense per telephone in service. During the war-time years some plant operations were reduced in volume, largely because of the restrictions on material usage. This was particularly true of construction operations. Because of the falling off in construction volume there was also some reduction in the expenditures chargeable to rearrangements and changes which arise from construction operations. Following the war there was a resumption of a large-scale construction program, which is necessary if the company provides the service desired by the customers in Georgia, and gross construction expenditures and associated rearrangements and changes expense increased substantially over the war level of expenditures. A major part of this increase was caused by the higher unit costs of labor, material, services, and other items involved in these operations. This high level of construction volume and its associated maintenance expense classified as rearrangements and changes in Georgia will, in the deponent's opinion, be as high or higher than in the year 1947 over the next several years. The deponent sees no possibility in the foreseeable future for any proper reduction in the level of *Page 862 
maintenance expense in Georgia. The upkeep of the plant should be adequate. Station removals and changes as ordered by our subscribers should be carried out to furnish them the service arrangements they wish, and there is no reasonable expectation that construction work will decrease in the next several years.
The commissioners testified: The cost of rearrangements and changes has increased from $433,551 in 1940 to $1,607,172 in 1947. This expense does not add to the value of the plant in service, even though related to construction, and is, therefore, a current operating expense and is charged to a special and separate maintenance account under the Uniform System of Accounts, and is thus segregated from the regular charges to maintenance which amounted to the additional sum of $6,489,588 for 1947 on an annual basis. The cost of construction and the related rearrangements and changes expense decreased during the war period due to the shortage of materials and manpower which prevented plant expansion. The unusual and abnormal increase in this item of expense is directly attributable to the cost of the present temporary accelerated expansion program, which is necessary to provide service to new and more than 50,000 would-be telephone subscribers. The question for determination by the commission was whether or not the present and old subscribers for telephone service would be required to pay in increased rates for that which has been brought about and incurred in order to provide service for new and would be subscribers. The average charge to maintenance for rearrangements and changes for the five-year period 1943 through 1947 would have been $822,825, had it been evenly distributed over this period in which construction was both unusually low and unusually high. By supplemental affidavit the commissioners set out gross plant additions, cost of rearrangements and changes, and the percent of the latter to the former for the years 1940, 1941, 1942, and 1947. For 1940 gross plant additions showed $6,981,858, cost of rearrangements and changes $433,551, percent 6.21. For 1947 gross plant additions showed $21,473,148, rearrangements and changes $1,607,172, percent 7.48. They testified that the Uniform System of Accounts provides for the amortization over a period of years of amounts not properly chargeable to one year's operations. *Page 863 
William K. Boardman Jr. testified by affidavit for the petitioner: Rearrangements and changes expense is a part of regular maintenance. The statement of the commissioners that the increase in this expense since 1940 was directly attributable to the expansion program was not an accurate statement, because a large portion of the increase was directly attributable to increased wages, salaries, cost of materials, cost of services, and increases in other costs entering into the item of expense. He sets out as Exhibit 1 a comparison between the maintenance cost of 1947, including rearrangements and changes, and 1940, by pricing out the actual 1947 expense based upon 1940 wage and price levels. This exhibit shows that the actual cost for maintenance in 1947 was $17.89 per telephone, which, at the 1940 wage and price levels, would have been $10.91 per telephone, while the actual 1940 cost was $10.88 per telephone. He further testified that he could foresee no reduction in the level of construction activities in Georgia for several years to come.
H. R. Stone testified by affidavit for the petitioner: The statement of the commissioners that rearrangements and changes expense is charged to a special and separate maintenance account under the Uniform System of Accounts was not accurate. There is no such account provided in the Uniform System of Accounts. Under it there is specific direction that the cost of work operations in the nature of rearrangements and changes be treated as any other element of maintenance cost, and the cost be charged to maintenance. The volume of such rearrangements and changes work is influenced by the construction program, but the dollars of cost is greatly influenced by the cost of labor, materials, and other items. The company's building program will continue at the present high levels for the next several years.
As to depreciation, Ralph C. Pate testified by affidavit for the petitioner: He had over twenty-five years of experience with Southern Bell, all of which time had been spent in the company's plant and engineering departments, where he served as plant manager, plant chief, plant supervisor, cost engineer, and inventory and cost engineer. He is at present a staff head in the General Engineering Department with the title of Inventory and Cost Engineer. He is responsible for the determination of the *Page 864 
depreciation rates used by Southern Bell. He is familiar with the characteristics of telephone plant and with the factors entering into the determination of depreciation rates therefor. He is responsible for recommending changes in the depreciation rates when conditions indicate the necessity for such changes. Constant studies under his supervision and direction are carried on to enable him to discharge his duties. All property used in rendering telephone service eventually becomes no longer useful and must be retired because of wear, tear, decay, inadequacy, obsolescence, changes in the art, and changes in demand. It is therefore equitable to spread this eventual loss over the period of time when the property is in service. The Uniform System of Accounts, with certain minor exceptions, provides that this retirement loss be charged to operating expense through equal annual depreciation charges, thus accumulating a reserve to cover the loss sustained when the property is ultimately retired from service. The procedure for determining annual depreciation is set out in the Uniform System of Accounts, and the deponent proceeds to explain the same. The company, as required by the Federal Communications Commission, maintains special property records for the sole purpose of studying past experience, from which the service lives of property and the salvage to be recovered therefrom upon retirement may be determined. These records must be studied in the light of future probability, however, and this requires the use of informed judgment. (The deponent then sets out the methods by which the depreciation rates are determined and the rates themselves.) The depreciation rates developed as described by the deponent have been accepted regularly for a great number of years by the Department of Internal Revenue for Federal Income Tax purposes.
As to depreciation, the commissioners testified by affidavit: The depreciation charges to Georgia operating expenses by Southern Bell for the third quarter of 1947, projected to an annual basis, were $3,097,640. The affidavit of Sven Hansel in this case states that $3,018,000 is an adequate amount for depreciation expense for Georgia operations of the petitioner in 1947. This figure is $79,640, or 2.6 percent, less than the amount above stated. *Page 865 
N. Knowles Davis testified by affidavit for the commissioners: Under the life-span method used by Southern Bell for calculating depreciation expense on approximately one-third of its depreciable property, the estimated depreciation rate and the resulting depreciation expense, is based on judgment, and when life spans exceed estimates made in the past, the accrual rate and the resulting depreciation expense is too high for the period in question. Under the turn-over method of estimating depreciation expense, the petitioner has not developed life-characteristic curves for certain major items of depreciation plant, but has assumed that life-characteristic curves for a plant of a wholly different nature were properly applicable thereto. Service lives selected by the petitioner for estimating depreciation rates under the turn-over method and under the mortality method are shorter in many instances than indicated service lives from recent turn-over and mortality studies and, further, depreciation expense, based on shorter service lives than realized, was more in amount than actually required during recent years.
Sven V. Hansel testified by affidavit for the commission: He is at present employed by the Securities and Exchange Commission with the title of Utilities Engineer, and before 1947 was in charge of the Securities and Exchange Commission investigation in the field of utility depreciation. He was loaned by that commission to the Georgia Public Service Commission for a period of approximately one month, during which time he made a study of the depreciation rates and depreciation reserve of Southern Bell in Georgia, reviewing and considering data furnished him by Southern Bell. He reviewed the various methods employed by the company in arriving at its depreciation rates. Based upon this study, he concluded that a composite rate of 4 percent per annum of the depreciable property of Southern Bell would represent a fair rate of depreciation. He determined that the service lives and salvage figures used by Southern Bell did not follow the statistical data upon which they are based. The rates developed by him were based upon his estimate of the average service lives of each class of depreciable property. By applying the rates developed by him, he arrived at a composite rate of 4 percent, which resulted in a depreciation charge of $3.018,000. *Page 866 
N. Knowles Davis testified by affidavit for the commissioners: He is familiar with the various elements and factors entering into depreciation, as well as various methods used for the determination of depreciation expense and the provision for depreciation on an accrual basis, as well as the methods and practices involved in the treatment of depreciation for establishing a rate base. Southern Bell employs the straight-line method of depreciation, under which the average life service of the components of its depreciable property is estimated, and which, together with estimated cost of removal and salvage values, is used in the determination of a percentage factor to calculate depreciation expense. The so-called life-span method is employed in estimating depreciation expense on approximately one-third of its depreciable property. The so-called mortality method is used to estimating depreciation expense for another one-third of depreciable property. The so-called turn-over method is used to estimate depreciation expense for about one-fourth of depreciable property, and expense of depreciation for the remainder is based on pure judgment. Under the life-span method the company estimates the actual retirement date of major items of property, and from this determines the necessary depreciation expense, so that a full depreciation reserve will be accrued with respect thereto at the end of the service life. Depreciation-expense figures are, of course, amended from time to time to correct for under estimates of service life when they become apparent, but this does not retroactively correct the depreciation expense in years prior to the revision of depreciation rates. Under the mortality method, the company, according to testimony before the commission, relies on historical data in the determination of service lives. It was developed, however, that service-life estimates used by the company were in numerous instances shorter than recent service lives experienced by the company for the class of property to which this method of estimating depreciation expense is applied. If services lives experienced in the future are merely nearly in line with the past experience of the company with reference to classes of plant to which the mortality method applies, then the current depreciation expense accruals of the company on this class of plant are excessive. Although the company contended that the war periods had extended *Page 867 
service lives of plant beyond that which would have normally occurred, it does not appear that their experienced service live will be as short as now estimated, nor need the depreciation expense accruals be quite as high as predicted to be necessary. The turn-over method of estimating depreciation expense would be correct if the plant was static and if replacements of plant are made at the same unit price as those units of plant are displaced. Since these conditions do not obtain, it is necessary to adjust the turn-over method results for growth. Adjustments proper for growth require the use of so-called life-characteristic curves for the type of plant in question. The degree of error thus introduced can not be ascertained without determining the true life-characteristic curve of the plant in question. Pure judgment is used on a relatively small portion of the company's depreciable plant in the estimation of depreciable rates, and the resulting depreciation expense applicable thereto. Judgment is susceptible to error and may well result in depreciation-expense charges in excess of that actually required.
Ralph C. Pate testified by affidavit for the petitioner: A composite rate of depreciation as testified to by Mr. Hansel, without specific findings on each depreciation rate, could have no possible value in determining depreciation rates. While Mr. Hansel stated that he had developed individual rates for all classes of property, these figures had not been made available to the deponent or Southern Bell or the court. To develop depreciation rates for Southern Bell properties, it would have been necessary for Mr. Hansel to make determinations of 132 separate and distinct basic factors after studying the historical background and future probabilities of each of these factors. Based upon the experience of the deponent over the years, he is of the opinion that no person can give "careful study and consideration to the entire question of depreciation expense for Georgia" in the short space of one month's time. Mr. Hansel, in his affidavit, does not purport to have knowledge of the problems involved in the design and operation of the telephone plant in Georgia or any knowledge of the economic conditions in Georgia or telephone-plant growth in Georgia or the company's practices as to retirements of plant in Georgia or the company's plans for the future. *Page 868 
Without knowledge of and consideration of these factors, the composite rate of depreciation arrived at by Mr. Hansel could not possibly be accurate.
On March 26, 1948, the court entered an interlocutory order as follows: "The defendants, their agents and attorneys, are temporarily restrained from in any wise obstructing the Southern Bell Telephone and Telegraph Company from putting in force immediately such schedule of rates that will produce an annual return of $360,765 in addition to the revenues authorized by the defendant commission in the rate schedule fixed by its order of January 23, 1948, and from imposing or seeking to impose any penalty or penalties upon Southern Bell Telephone and Telegraph Company or upon any of its officers or representatives by virtue of its putting into effect a schedule of rates that will produce such additional sum, provided and conditioned, however, as follows: (a) That plaintiff shall post a bond in the amount of $400,000 with security to be approved by the clerk of this court conditioned to repay to the telephone subscribers and users of intrastate toll services of petitioner in the State of Georgia any amounts which the plaintiff may collect from such subscribers or toll users by virtue of this temporary restraining order in excess of such rates as may be finally adjudged to be lawful. The said bond shall be payable to the Public Service Commission of Georgia for the use and benefit of said Georgia telephone subscribers and users of toll service of petitioner; and (b) the plaintiff to file with the defendant commission within ten days from the date and execution and filing of said bond a schedule of proposed telephone and toll rates that the company proposes to put into effect in order to raise the additional revenue of $360,765, and likewise to file copy of such schedule with this court; and (c) that plaintiff shall keep a complete and itemized record and books showing the increases paid by each customer and user of its toll service, so that, in the event it shall be held that the increases paid under this order shall be refunded, such refund and repayments shall be promptly and expeditiously made to those entitled thereto. Nothing in this order shall interfere or prevent the commission from exercising its regulatory powers over the plaintiff company as to the fixing of service rates and toll rates or having herein *Page 869 
hearings thereon or revising such rates, or in any other manner exercising their lawful powers, except that any such action or actions shall be in conformity to and not contrary to any provision of this order. The separate opinions of the three judges are attached hereto."
In bill of exceptions No. 16241, Southern Bell Telephone and Telegraph Company v. Georgia Public Service Commission et al., the plaintiff in error assigns error on the interlocutory order in so far as it denies it any of the relief sought by it except the portion of relief granted.
In bill of exceptions No. 16248, Georgia Hotel Association v. Southern Bell Telephone and Telegraph Company, the plaintiff in error assigns error on the judgment sustaining the demurrer to its petition for intervention and disallowing the intervention, and on the judgment granting the interlocutory order.
In bill of exceptions No. 16249, Georgia Public Service Commission v. Southern Bell Telephone and Telegraph Company, the plaintiff in error assigns error on the following: (a) the judgment overruling the commission's motion to dismiss the petition; (b) the judgment sustaining objections of the petitioner to certain facts set out in the affidavit of the defendants, entitled "General," and having to do with the commission's actions and reasons for promulgating its rate order of January 23, 1948; (c) the judgment sustaining certain special demurrers of the petitioner to the defendants' answer; (d) the judgment granting the interlocutory injunction.
1. Headnotes 1, 2, 3, and 4 require no elaboration.
5. The Georgia Public Service Commission is a constitutional board. Article 4, section 4, paragraph 3 (Code, Ann. Supp., *Page 870 
§ 2-2703). The law vests in this board the exclusive authority to determine and fix what are just and reasonable rates. Code, § 93-309. The function of making telephone rates is legislative in nature, and such rates can not be judicially fixed by courts. 43 Am. Jur. 634, § 83; Central Kentucky c. Co. v. Railroad Comm.,290 U.S. 264 (2) (54 Sup. Ct. 154, 78 L. ed. 307).
6. But where in a case properly brought it is shown that the rates fixed by the commission are confiscatory and protection by a court of equity is sought to prevent a violation of the due-process provisions of the State and Federal Constitutions, the court is required to adjudicate the question and to render a judgment that will afford the complainant full protection of its constitutional rights. Both the courts of this State and of the United States have accepted jurisdiction and rendered judgments in rate cases where it was alleged that constitutional rights were imperiled. Southern Ry. Co. v. Atlanta Stove Works,128 Ga. 207 (57 S.E. 429); City of Atlanta v. Atlanta Gas LightCo., 149 Ga. 405 (100 S.E. 429); City of Atlanta v.Georgia Ry. Power Co., 149 Ga. 411 (100 S.E. 442);Georgia Ry. Power Co. v. Decatur, 152 Ga. 143
(108 S.E. 615); Georgia Public Service Comm. v. A. W. P. R. Co.,164 Ga. 822 (139 S.E. 725); Georgia Public Service Comm. v.Georgia Power Co., 182 Ga. 706 (186 S.E. 839); Pacific Tel.c. Co. v. Kuykendall, 265 U.S. 196 (44 Sup. Ct. 553,68 L. ed. 975); McCardle v. Indianapolis Co., 272 U.S. 400
(47 Sup. Ct. 144, 71 L. ed. 316); West Ohio Gas Co. v. Comm., 294 U.S. 63
(55 Sup. Ct. 316, 79 L. ed. 761). While it was held in Market Street R. Co. v. Comm., 324 U.S. 548 (65 Sup. Ct. 770,89 L.ed. 1171), that the utility company could not be said to suffer injury if the rate is fixed for an experimental period which will probably produce a fair return, and while it was also held in New York v. United States, 331 U.S. 284 (67 Sup. Ct. 1207,91 L.ed. 1492), that where the result of an order is not clearly confiscatory but its precise effect must await operation under it, the court has refused to set it aside despite grave doubts as to its consequences, citing City of Knoxville v. Knoxville Water Co., 212 U.S. 1. (29 Sup. Ct. 148, 53 L. ed. 371), Wilcoxv. Consolidated Gas Co., 212 U.S. 19 (29 Sup. Ct. 192,53 L.ed. 382, 48 L.R.A. (N.S.) 1134, 15 Ann. Cas. 1034), Darnellv. Edwards, *Page 871 244 U.S. 564 (37 Sup. Ct. 701, 61 L. ed. 1317), Brush Electric Co. v.
Galveston, 262 U.S. 443 (43 Sup. Ct. 606, 67 L. ed. 1076), and St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 69
(56 Sup. Ct. 720, 80 L. ed. 1033), it is of the utmost importance that it be clearly noted that the situations referred to are those where the confiscation is not clearly shown, and, hence, the rule is not applied to confiscatory rates. We find no decision of any American court where it has been held that when confiscation is clearly shown the court will refuse an appeal of the injured party for a judgment protecting his constitutional right. In both City of Knoxville v. Knoxville Water Co., and Wilcox v. Consolidated Gas Co., supra, it was held that where there is a clear confiscation the court should act without hesitation. The present losses suffered as a result of confiscatory rates can not be made up in the future. Federal Power Commission v. Natural Gas Pipeline Co. 315 U.S. 575
(62 Sup. Ct. 736, 86 L. ed. 1037); Monroe Gaslight Fuel Co. v.
Michigan Public Utility Commission, 292 Fed. 139. But even if the law would permit the Public Service Commission of this State to establish rates at some future time for the purpose of making up losses inflicted by past confiscatory rates, there can be no assurance that such future rates would be established. If the present members should remain in office, they might refuse to establish such future rates; and since the offices are filled by election, there is no way to know what would be the attitude of the new members that may be elected in the future. In addition, it is not fair to future customers to have a rate imposed upon them for the purpose of compensating for services rendered customers in the past. Fundamental constitutional rights must not be made to depend upon speculation that some future event might occur to repair present injury inflicted, but should receive the full protection of prompt judicial action to prevent the injury.
While there appears in this record no demurrer or motion challenging the jurisdiction of a court of equity, counsel for the commissioners have argued at length in support of the contention that the judgment here under review is void, that equity has no jurisdiction since there was available to the petitioner an adequate legal remedy by the writ of mandamus under the Code, § 64-101, and that equity under § 37-121 will not take cognizance of a *Page 872 
plain legal right where an adequate and complete remedy is provided by law. Since the jurisdiction of the court was not questioned in any manner provided by law, it can not be raised here unless the judgment on its face shows want of jurisdiction. But even if the existence of a remedy at law would show that the court of equity was without jurisdiction to render the judgment here, mandamus, being a process to require a public official to act, is not available to control or change his action taken in the exercise of a discretion vested in him by the law, and would not be available to the petitioner. Thomas v. Ragsdale,188 Ga. 238 (3 S.E.2d 567); Ex parte Ross, 197 Ga. 257
(28 S.E.2d 925); Interstate Commerce Commission v. United Statesex rel. Campbell, 289 U.S. 385 (53 Sup. Ct. 607,77 L. ed. 1273); United States ex rel. Kansas City Southern Ry. Co. v.
Interstate Commerce Commission, 6 F.2d 692; United Statesex rel. Delaware Hudson R. Corporation v. Interstate Commerce Commission, 51 F.2d 429; United States ex rel.
Kroger Grocery Baking Co. v. Interstate Commerce Commission, 73 F.2d 948. The grievance here is, not that the Public Service Commission refuses to hear and act upon the application of the telephone company for increased rates, but that the commission, having so heard and acted thereon, has fixed rates that are confiscatory. Mandamus could merely require that the commission act again in the exercise of that discretion vested in it by law, and which is subject to errors in its conclusions. If the evidence shows that the rates ordered will result in confiscation, a court of equity has jurisdiction to render the judgment here complained of. Rates that are unjustly and unreasonably low are confiscatory.
7. It is conceded in the testimony of the commissioners, and is nowhere contradicted by the evidence in the case, that the telephone company was required to earn additional annual revenue amounting to $3,715,983 over and above that produced by rates in force before the order of January 23, 1948. The commissioners further testified that the rate order would produce approximately $1,600,000 of this required additional revenue. It was testified by the commissioners that the remainder of the additional required revenue would be obtained by suspension of expenditures of the company hereinafter listed and discussed, which *Page 873 
total the difference between the amount required and the amount produced by the new rates, thus converting them into receipts instead of expenses. It is at once apparent that, based upon the evidence of the defendants, the question is whether or not these items of expense are, as contended by the commissioners, not allowable in rate making and should be converted into receipts or whether they are, as contended by the telephone company, necessary and allowable expenses of operation, to be considered in computing rates and in determining the question of confiscation.
The first item in this class is $360,765 annually paid to the American Telephone Telegraph Company under a contract for services furnished the Bell Company at a cost of 1 1/2% of its gross receipts. The undisputed evidence shows that the petitioner obtained substantial benefits under this contract. It shows that the company realizes benefits amounting to many times the amount of this expenditure as a result of and in virtue of this contract. The evidence demanded a finding, as was held by the trial court, that this was a legitimate and proper expenditure, and that it must be considered in computing rates. Such expenditures have been held to be proper expenses. Missouri exrel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276 (43 Sup. Ct. 544, 67 L.ed. 247, 42 A.L.R. 1232); State ex rel. Hopkins v. Southwestern Bell Telephone Co., 115 Kansas 236 (223 P. 771); State ex rel.
Pacific Tel. c. Co. v. Department of Public Service, 19 Wn.2d 200
(142 P.2d 498). Our ruling on this item alone shows a case of confiscation in the amount of this item.
The next item in this category is $63,984, annual expenses actually paid in the rate case before the commissioners. It is contended by the commissioners that this, being a nonrecurring expense, was not a proper expenditure for consideration in computing rates. In Driscoll v. Edison Co., 307 U.S. 104, 120
(59 Sup. Ct. 715, 83 L. ed. 1134), it was said: "Even where the rates in effect are excessive, on a proceeding by a commission to determine reasonableness, we are of the view that the utility should be allowed its fair and proper expense for presenting its side to the commission." Such expenses were approved in West Ohio Gas Co. v. Comm., 294 U.S. 63 (55 Sup. Ct. 316,79 L. ed. 761), the *Page 874 
court saying: "Thus viewing them, we think they must be included among the cost of operation in the computation of a fair return." However, this is, as testified by the commissioners, a non-recurring expense. It may lawfully be apportioned over a period of years by the rate-making authority, and a court, being without authority to make rates, can not allow the full amount of this item in ascertaining if confiscation exists. Therefore, while as a matter of law the commissioners would be required to treat this item as a necessary expense in computing rates, the trial court did not err in its refusal to allow this item in full in fixing the amount of revenue which the company would be allowed to collect until rates are fixed by the Public Service Commission.
The next item is $97,180, losses annually sustained in the operation of lunch rooms for the company's employees. This item was not allowable in computing the proper rates.
An item in controversy is $76,844 per annum of interest arresting accruals paid by the company into its pension trust fund. In substance the company showed by evidence that from 1913 through 1926 it maintained a pay-as-you-go pension plan for its employees. In 1941 the last of a series of steps was taken by the company to put its pension plan on a sound actuarial basis where the actual contributions thereunder would be stable and the fund actuarially sound and solvent. This involved contributing to the pension fund annually an amount equal to the actuarially determined liability for future pensions accruing during each year. Because this pension fund was started a number of years after the business had been running, the employees had accumulated substantial periods of service, and the trust fund was smaller than it would have been had it been started at the beginning of business. This deficit is designated in the evidence as a part of the unfunded reserve requirements. The basis upon which the plan rests contemplates an interest return on the trust fund annually, and the item here is a payment of the amount of interest that this unfunded reserve requirement of the trust fund would have earned had it been actually paid in by the company. Since the solvency of the plan requires interest on the reserve, and since this portion of the reserve has not been paid, failure to pay this interest thereon will ultimately allow exhaustion and *Page 875 
insolvency. The only evidence offered by the defendants why this expenditure should not be allowed was that the parent, American Holding Company, had determined that the fund was insufficient, and that the assessment is a charge against the rate payers of Georgia over and above current pension accruals. The defendant's evidence showed that of the total of $1,150,603 charged to Georgia operating expense in 1947 for relief and pensions $945,552 was ear-marked for pensions. When the interest charge is deducted, the balance allowed by the commission as operating expenses for pensions alone would be $868,708. There is no evidence disputing the fact of payment or the propriety or necessity for the payment. Such a payment was approved in Stateex rel. Pacific Tel. Tel. Co. v. Department of Public Service, supra. It is a proper operating expense and must be considered in computing rates.
Two annual items in controversy are operators' wages, $556,000, and operators' employment and training, $100,000. Proof was made by the company of actual payment of these items for 1947 by projecting the third and fourth quarters of that year. The witness Davis for the commissioners said that a different amount results by projecting the fourth quarter of 1947. The commissioners testified that these items had greatly increased during the last few years, but that they would decline in the future because it will be necessary only to replace existing personnel as such personnel leaves the employment of the Southern Bell. To this testimony the company replied by showing the actual facts and conditions of employment; and based upon these statistics testimony was given that these items, instead of decreasing creasing in the future, would increase. We think that the language of the Supreme Court of the United States in West Ohio Gas Co. v. Comm., 294 U.S. 79, 82 (supra), applies forcefully to this situation. It was there said: "But prophecy, however honest, is generally a poor substitute for experience. `Estimates for tomorrow can not ignore prices of today.' [Citing] We have said of an attempt by a utility to give prophecy the first place that `elaborate calculations which are at war with realties are of no avail.' Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 164." It was further said in that decision at page 83 that *Page 876 
"Present confiscation is not atoned for by merely holding out the hope of a better life to come." If the rate disallowing this expense amounts to confiscation presently, it constitutes no legal excuse or justification to prophesy that the confiscation will decrease as the years go by. These expenses are properly allowable in rate making, the exact amount of which is to be found by the trial court from the evidence.
Another annual item of expenditure by the company challenged by the commission is $150,000 local commercial expense. The company showed that this department was responsible for the proper conduct of the office business with its customers, the general public and other public utilities, giving in detail the services rendered. The only evidence offered in opposition was to show the increase in the amount of this item for the year 1947 over the year 1939, which was 312 percent, while the average number of telephones in service had increased for the same period only 102.41 percent, and that unfilled applications for services on December 31, 1947, were 50,881, a reduction of 8658 of the number of such applications on June 25, 1947. Here again the actual is challenged only by future expectancy, and the court should have found this item a proper charge.
The next item is $50,000 annually for advertising expense. This item was disapproved, by the evidence of the commissioners, upon the ground that the company already had more applications for telephones than it could fill and, therefore, it should not advertise for more. The testimony of the company's witnesses was that the advertising consisted in part of twenty notices in the papers to acquaint the public with the proper use of party lines, eleven relating to the issue and distribution of new telephone directories, four to the conversion of services from the manual to the dial telephone, all testimony of the company showing that the money was actually spent for advertising purposes considered by the management to be in the public interest. It was, therefore, a proper expense, and must be considered in computing rates. West Ohio Gas Co. v. Comm., supra.
Another annual item in this category was accounting department expenses of $160.942, which the company's evidence showed, by pointing out the details of the work, were necessary expenses *Page 877 
in the operation, and no evidence was offered to contradict that introduced by the company; being thus shown to be a necessary operating expense, it must be considered in computing rates.
Another annual item was rearrangements and changes expense. This item was explained in detail by evidence offered by the company, which showed the amount of work required to rearrange or change or to connect or disconnect the existing plant to make it more useful or serviceable or to coordinate the existing plant with additional plant added by new construction, the moving of telephone instruments and apparatus from one location to another, and changing the types of equipment. This evidence was met by evidence from the defendant commissioners showing increases from 1940 to 1947, and that it does not add to the value of the plant in services and, therefore, is current operating expense, and under the uniform system of accounts is segregated from the regular charges on maintenance; that the unusual and abnormal increases in this item of expense are directly attributable to the cost of the present temporarily accelerated expansion program which is necessary to provide service for more than fifty thousand would-be new subscribers. The company showed that the increase in this item from 1940 to 1947 was largely attributable to increase in wages, salaries, cost of materials, cost of services, and increases in other costs entering into the item of expense, and not, as testified by the commissioners, to the construction program. This evidence showed that the actual cost for maintenance in 1947 was $17.89 per telephone, which at the 1940 wage price level would have been $10.91, thus demonstrating that the increase is due almost entirely to the increases in wages and prices of materials. This item should, under the evidence, be allowed for rate-making purposes.
The remaining item of this category is annual depreciation expense of $79,640. The evidence as given by the company sustains this item of expense. The evidence of the defendant commissioners contradicts and asserts that the item is unjustified, but the basis upon which this conclusion is reached appears to be rather unreliable, and the trial court, in the exercise of its discretion, might have accepted either.
In accordance with the foregoing rulings on the items discussed, *Page 878 
it is held that only that of depreciation expense of $79,640 and lunch rooms operating loss of $97,180 could, under the evidence, have legally been deducted in its entirety from the sum stated by the commissioners to be necessary as additional revenue, and that in some others the exact amount is to be ascertained by the trial court from all the evidence. Hence, the evidence shows that, after giving full credit for the additional revenue which the commissioners say the order here under attack would produce, there would remain an actual confiscation of more than two million dollars of the company's property. While it is the duty of the Public Service Commission to searchingly inquire as to all expenses of a public utility in its rate-making function, and while such matters as contracts between the utility and its parent company should be closely scrutinized, yet where as here the only evidence touching such contract shows that the utility and its parent company should be closely scrutinized, yet where as here the only evidence touching such contract shows that the utility receives in benefits many dollars for every dollar paid under that contract, such evidence leaves no ground for criticism. The commissioners are not the managers of this company, but their function is to regulate and disapprove any dishonest or clearly inefficient conduct and practice by the utility. Public regulation must not supplant private management.Georgia Public Service Comm. v. A. W. P. R. Co., 164 Ga. 822
(supra); Missouri ex rel. Southwestern Bell Telephone Co.v. Public Service Commission, supra; Chicago M. St. P. Ry. Co. v. Wisconsin, 238 U.S. 491 (35 Sup. Ct. 869,59 L. ed. 1423, L.R.A. 1916 A. 1133; Banton v. Belt Line Ry., 268 U.S. 413
(45 Sup. Ct. 534, 69 L. ed. 1020). In West Ohio Gas Co.v. Comm., supra, it was said: "In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs [managers of a business] as to the measure of a prudent outlay." From what has been said it follows that the court did not err in granting the interlocutory injunction against the enforcement of the rate order of January 23, 1948.
8, 9. But it is contended by counsel for the commissioners that, in attaching to the injunction order the provision that the company would be allowed to collect rates to produce the additional revenue in the amount of $360,765, the court thereby exceeded its jurisdiction and engaged in rate making, and, hence, *Page 879 
committed error. In Newton v. Consolidated Gas Co., 258 U.S. 165
(42 Sup. Ct. 264, 66 L. ed. 538), it was held: "As a condition to an injunction against a gas rate found confiscatory, the court has discretionary power, which, however, should be exercised very cautiously, to prescribe a maximum future rate for a specified period as a limitation in favor of consumers." Where the rate is enjoined, the utility can fix its own rates, provided only that they be just and fair, until new rates are made by the rate making commission. 43 Am. Jur. 603, § 101. A court of equity has power to require those seeking equity to do equity by attaching conditions to its judgment. Public Service Commissionv. Indianapolis Rys. Inc., (Indiana) 72 N.E.2d 434; s. c.76 N.E.2d 841; New York Mut. Gaslight Co. v. Newton, 269 Fed. 452; Augusta-Aiken Ry. Electric Corporation v. Railroad Commission, 281 Fed. 977; Central Kentucky Natural Gas Co. v.
Railroad Comm., 290 U.S. 264. It was equitable and right in the present case, since by injunction the rates promulgated by the Public Service Commission were rendered ineffective, and that commission was enjoined from prosecuting or penalizing or in any wise interfering with the telephone company in collecting for its services. The judgment is not rendered erroneous because a condition to insure equity is attached. In re Arkansas Railroad Rates, 168 Fed. 720; Public Service Railway Co. v. Board of Public Utility Commissioners, 276 Fed. 979.
But this conditional part of the judgment is subject to the criticism that it fixes a maximum of revenue which will cause a continuance of the confiscation, thereby defeating the sole object of the suit. As pointed out in division 7 of this opinion, the evidence, without contradiction, shows that to avoid confiscation it is necessary that the company obtain $3,715,527 in additional revenue annually above that resulting from rates in force prior to the January 23, 1948, rate order. With the exception of the $79,640 depreciation expense, as to which the evidence is in conflict, and also the $97,180 loss in operating lunch rooms for employees, and rate-case expense of $63,984, and fixing the total amount of other items where the evidence is in conflict, this amount must, under the evidence, be realized over and above that produced by the old rates, and the court erred in not allowing it instead of the wholly inadequate amount of $360,765. *Page 880 
The court has no power to interfere in any manner with the full and free functioning of the Georgia Public Service Commission in the exercise of its exclusive authority to fix future rates for this company. We do not construe the injunction order to enjoin such action, and accordingly rule that it does not prevent such free action by the commission at any time.
For the reasons stated in headnote 3, the judgment in case No. 16248, Georgia Hotel Association v. Southern Bell Telephone and Telegraph Company, is affirmed. For the reasons stated in the foregoing opinion the judgment in case No. 16249, Georgia Public Service Commission v. Southern Bell Telephone and Telegraph Company, is affirmed, and the judgment in case No. 16241, Southern Bell Telephone and Telegraph Company v. Georgia Public Service Commission et al., is reversed in so far as it imposes a condition in the injunction order as to the maximum additional revenue to be collected by the company.
Judgment affirmed on bill of exceptions No. 16248. DUCKWORTH, P. J., WYATT, and HEAD, JJ., and JUDGES KNOX, A. M. ANDERSON, CARPENTER, and SLOAN concur.
Judgment affirmed on bill of exceptions No. 16249. DUCKWORTH, P. J., and JUDGES KNOX, A. M. ANDERSON, CARPENTER, and SLOAN concur. WYATT and HEAD, JJ., dissent.
Judgment reversed on bill of exceptions No. 16241 in so far as it imposes a condition in the injunction order as to the maximum additional revenue to be collected by Southern Bell Telephone and Telegraph Company. DUCKWORTH, P. J., and JUDGES KNOX, A. M. ANDERSON, and SLOAN concur. Judge CARPENTER concurs specially for the reason that he is of the opinion that the court was without authority to impose any condition whatever in the injunction order. WYATT and HEAD, JJ., dissent.